## STATE v. LATTA FINCH.

### (Filed 27 May, 1919.)

1. **Homicide—Self-Defense—Instructions—Evidence.**

   An instruction on a trial for a homicide that should the jury find the facts to be as testified they should find the defendant guilty of manslaughter, constitutes reversible error where there is evidence in the prisoner's behalf of a perfect self-defense, for such evidence will be taken as true on appeal and interpreted in the light most favorable to the prisoner.

2. **Homicide—Self-Defense—Escaped Convict—Rearrest—Resisting Arrest.**

   While ordinarily one on trial for a homicide may not establish his plea of a perfect self-defense when he has wrongfully provoked a difficulty, involving a breach of the peace, and kills his adversary in the progress of the fight, unless at a time prior to the killing he had quitted the contest and in some way signified his purpose to do so, this doctrine does not apply when the deceased knowingly resisted rearrest by an officer from whose lawful custody he had escaped, who shot and killed the deceased under a reasonable apprehension of death or great bodily harm, and without excessive force, as it appeared to him under the circumstances, the reasonableness of this apprehension and of the force he used being ordinarily questions for the determination of the jury.

3. **Homicide—Convicts—Escape—Rearrest—Counties.**

   A township superintendent of convicts and one of his guards, when summoned by him for the purpose, may lawfully rearrest in any county of the State without a new warrant one of the convicts who had escaped from his custody while serving a sentence of court, and hold him until his time had fully expired, not counting the time he was wrongfully out of prison by reason of the escape. Revisal, sec. 5407.

4. **Same—Common Law—Statutes—Constitutional Law.**

   The common-law doctrine that an escaped convict may be rearrested in any county of the State without new process, by the officer in charge of him, to compel him to complete the service of the sentence imposed by the court, is not changed either by our Constitution or statutes (Revisal, secs. 2817 and 937) relating to the confines of the particular county, having reference to process and writs directed to them; and Revisal, secs. 3176-3182, not specifying or inhibiting the application of the common-law doctrine.

5. **Convicts—Escape Officers—Rearrest—Public Duty—Right Barred.**

   It is the duty of the lawful officer to rearrest an escaped prisoner as a requirement for the public interest, whether the escape was through negligence on his own part or voluntary, which right and duty cannot be barred or impaired by reason of the wrongful absence of the prisoner at the time, by his connivance or with his permission.

6. **Homicide — Convicts — Escape — Self-Defense—Evidence—Questions for Jury—Trials.**

   Upon the trial of an officer for the killing of an escaped prisoner whom he may have lawfully arrested, there was conflicting evidence as to whether the officer called the convict to the door of the house, and in-

stantly shot him and killed him, upon calling him to put up his hands just after the convict had opened it, or whether, at the time of the killing the convict motioned to draw, a pistol under circumstances threatening death or great bodily harm, and whether the convict knew he was being arrested by the proper officer of the law to compel him to fill his unexpired sentence imposed by the court and from which he had escaped: *Held*, it was for the jury to find the facts on the plea of a perfect self-defense and to acquit the prisoner should they find that the deceased knew that the prisoner was making the arrest as a lawful officer, and that the latter, upon being wrongfully threatened with the former's pistol, and knowing his reputation as a dangerous character, and from the other facts and circumstances as they reasonably appeared to him, in the judgment of the jury, acted upon the apprehension that it was necessary for him to kill the deceased to save himself from death or great bodily harm.

INDICTMENT for murder, tried before *Calvert, J.,* and a jury at December Term, 1918, of WAKE.

At the call of the cause for trial, the solicitor for the State announced in open court that he would not insist on a verdict of murder in the first degree but would ask for a verdict of murder in the second degree or manslaughter, as the evidence might disclose.

The testimony having been offered for the State and for the defendant, the court was of opinion that, in any aspect of the evidence, the defendant was guilty of the crime of manslaughter, and accordingly instructed the jury, in part, "That if they should find the facts to be as testified to by the defendant and his witness, W. J. Barbour, they must return a verdict at least of 'Guilty of manslaughter.'"

Defendant was convicted of the crime of manslaughter, and, sentence having been pronounced, appealed, assigning for error, among others, the ruling of the court on the question of manslaughter.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*Armistead Jones & Son and Wm. B. Snow for defendants.*

HOKE, J. There was evidence on the part of the State to justify a conviction of the offenses as prosecuted by the solicitor, but on a charge of this character, which in terms withdraws from the defendant any and all right to a perfect self-defense, it is the necessary and accepted rule with us that the facts which make for such a position on behalf of the defendant shall be taken as true and interpreted in the light most favorable to him, and considering the record in view of these principles, it was proved on the trial that on 5 September, 1918, at the home of Andrew Turner, in Wake County, said Turner being the father-in-law of deceased, and a tenant on the plantation of J. A. Stephenson, in said county, the defendant shot Walter Penny, inflicting

a mortal wound from which he later died.   There were also facts in evidence tending to show that this Walter Penny, convicted for carrying concealed weapons, had been sentenced and committed under the provision of the statute applicable, to work the roads of Clayton Township, Johnston County, apparently in the latter part of 1917, and that his term of imprisonment had not expired; that soon after his commitment under the sentence he escaped from the road force, and having been located by W. J. Barbour, superintendent of the road force of said township, having full charge and control of the convicts working thereon, he returned to the convict camp, after an absence of about ten days, and took his position as prisoner under his said sentence; that having remained with the force about ten or twelve days he overpowered the guard left to watch him and again escaped, and had not since been a prisoner; that on his second escape he at first lived with one Tink Hobby, on the latter's place in Wake County, and later he quit Hobby and went to Andrew Turner's, a tenant on the farm of J. A. Stephenson, also in Wake; that the deceased married the daughter of this Andrew Turner and the two were living with Andrew Turner, in Wake, at the time of the homicide.

It appeared, also, that while the deceased was working with Hobby, W. J. Barbour, said superintendent, was informed of the whereabouts of deceased, and being approached by Hobby with a request to allow the deceased to work on a while longer before his rearrest, had replied he had better do it as his houses for keeping his prisoners had recently burned and he had then no proper place to restrain or keep them; that later, to wit, in September, 1918, having learned that the deceased was at Andrew Turner's, on the J. A. Stephenson place, he summoned the defendant, one of his guards, to go with him for the purpose and arrest the deceased; that about 8:30 or 9 p. m., of 5 September, they went to the house of Andrew Turner, and on inquiry were told that the deceased had not yet come in; that the two then drew off some little distance and concealed themselves in a cotton patch near the house. Later, Walter came in and Barbour and the defendant heard his people tell him that two men had been there to inquire for him, and on description given deceased said, "That's Captain Barbour. I am not going with him any damn where." He then said, "I wouldn't be surprised if the sons of bitches weren't hid out here in the cotton patch right now," whereupon he threw several rocks over into the cotton patch, some of them striking near the defendant and Barbour, his companion; that deceased having gone back into the house, defendant and Barbour went for Stephenson and induced him to go with them to the Turner house, thinking that deceased would more likely respond to his call and come out. Returning with Stephenson, Barbour went around to

the back door of the house and defendant and Stephenson were at the front door when the latter called to Andrew Turner and asked if Walter Penny was there. Andrew replied that he was and called him; that Walter came to the door, and as he opened the door Finch, the defendant, called to him to "throw up his hands." At this point the evidence on the part of the State is to the effect that when defendant called to Walter, "throw up your hands," he immediately fired, inflicting the fatal wound. On the part of the defendant, however, testifying in his own behalf, the witness said "That he had been notified that the deceased was a violent, dangerous man and that he would have to be very careful; that while he was lying in the cotton patch he had heard Walter say with an oath that he would go nowhere with Barbour, that he would die first. He also knew of his two escapes which occurred before defendant was employed as guard; that when Walter came to the door witness had not drawn his pistol but called to him to hold up his hands so the witness would be protected from a dangerous assault; that instead of obeying this order deceased immediately made a motion to his hip pocket as if to draw a weapon, when witness drew and fired towards his hand to disable him and protect himself; that he shot in the present belief that Walter was about to shoot him and for no other reason. There was other testimony corroborating defendant's evidence in part and also as to the bad reputation of the deceased for violence and that he would shoot, etc. It was further shown and urged in corroboration of defendant's position that the wound inflicted was three inches down and to the right of the middle towards the hip, but the shot had penetrated the larger intestine, lacerating the liver, and was a mortal wound, producing death as stated. It further appeared that Finch himself did not know Penny personally, the escape having taken place before defendant was employed as guard, and there was no testimony that the deceased had personal acquaintance with Finch.

On this, a sufficient statement of the occurrence to give a correct apprehension of the grounds of defendant's appeal, it is the accepted law in this jurisdiction that when one has wrongfully provoked a difficulty, involving a breach of the peace, and in the progress of the fight kills his adversary, he cannot maintain the position of perfect self-defense unless, at some time prior to the killing, he has quitted the contest and in some way signified his purpose to do so. *S. v. Crisp,* 170 N. C., 785-790; *S. v. Kennedy,* 169 N. C., 327. On the record, if defendant, without lawful excuse, went to the place where deceased made his home, called him to the door and ordered him to throw up his hands, such conduct, in its most favorable aspect, would come well within the principle stated, and as his Honor held, would preclude defendant from

maintaining the position of perfect self-defense, and the question of his right to go to the jury on such an issue would largely depend on whether he acted as of right when, as assistant to Barbour, the superintendent of convicts in Johnston County, he engaged in the effort to arrest the deceased in Wake County, having no warrant for the purpose; and second, whether, if he had the power, he was proceeding to exercise it in a lawful and proper manner. Recurring to the facts in evidence, it appears that W. J. Barbour was the superintendent, having the lawful custody and control of the convicts working the roads in Clayton Township, Johnston County; that the deceased was under a lawful sentence and commitment to work the roads in said township, said county, for a stated period; that he had escaped by overpowering his guard, and the time of his imprisonment had not then expired, and on such facts we are of opinion that the superintendent, having lawful charge of said convicts, as stated, was empowered, without warrant, to recapture the escaped prisoner anywhere within the borders of this State, assuredly, and hold him till his sentence had fully expired, and that, both on precedent and, with us, by express provision of our statute, the time when he was wrongfully out of prison by reason of his escape is not to be counted. *Clark v. Commonwealth,* 62 Va., 777; Rev., sec. 5407. This we think was undoubtedly the approved position at common law, and we find nothing in our Constitution or statutes that in any way destroys or impairs its effect and operation at the present time. The principle and the reason upon which it rests is very well stated in *Pearl v. Rawdin,* V Day's Reports, pp. 244-249, as follows: "When an officer holds any person a prisoner in legal custody, on arrest, and the prisoner escapes by force or otherwise, against his will, the officer has a right to his body and power to retake him at any place to which he may abscond. It is a matter of no consideration whether his original writ could have been legally served within the jurisdiction in which he retakes him, for he retakes him not by that writ, but by virtue of the hold he had on him by the arrest.

"By the common law, if a prisoner escapes into another county in which the sheriff has no jurisdiction, and is there retaken, the retaking is legal, and the prisoner shall have no remedy by *audita querela,* for he shall not take advantage of his own wrong. *Boynton's case,* 3 Co., 43; *Ridgeway's case, ibid.,* 52." The same position is fully recognized in a case in our own Court of *S. v. Stancil,* 128 N. C., 606. In that case a prisoner, sentenced to the roads in Mecklenburg County, had escaped ten years before and was, at the time of the homicide, in the adjoining county of Gaston. Meantime there had been a change of superintendents and the superintendent who then filled the office, having

·ascertained where the deceased was, went to Gaston County, and with-·out warrant and without announcing his authority, engaged in the en-·deavor to arrest the deceased, who fled and was shot and killed as he ran. ·On these facts a conviction for manslaughter was upheld by a divided Court, but a perusal of the case will show that the ruling was made to rest on the wrongful manner in which the defendant had proceeded, and there was no difference of opinion among the judges as to the power ·of the superintendent of the road force of Mecklenburg County to arrest ·an escaped prisoner, without warrant, in the county of Gaston. Thus, ·*Chief Justice Furches,* who wrote the prevailing opinion, after sustain-ing the conviction on the ground that "The superintendent of a convict gang, *not known* to *be* an *officer,* has no right to shoot or kill one who, having committed a petit larceny and having escaped from prison, is *running away to avoid arrest,*" on the question of the power to make ·such an arrest, said: "Nor do we think the fact that the prisoner was the superintendent of the convict camp in Mecklenburg County gave him ·any authority to make the arrest under the facts in this case. And in saying this, we will not be understood to say that we do not think the superintendent of a convict camp would not, ordinarily, have the right to arrest an escaped convict. This we think he would have, where the ·convict knew that he was such superintendent. And he would have this right in such case without making known the fact that he was such ,superintendent, as this would be useless if the escaped prisoner knew the fact. Nor do we think that in such a case it would be necessary for such superintendent to procure any other authority to do so. In fact, we know of no one who would be authorized to give him any other authority.

"But in this case it had been ten years since Rossell escaped, and when he did so one Sossaman was superintendent. The prisoner (defendant) did not know Rossell, and had him pointed out; and there is not the ,slightest evidence that Rossell knew him or knew that he was superin-tendent of convicts in Mecklenburg County. This being so, we are of the opinion that the prisoner had no more right to make the arrest than any private citizen would have had." And in the dissenting opinion by his Honor, *Cook, Judge,* concurred in by the present Chief Justice, the doctrine as it prevailed at common law and which is said to be still ·controlling is stated as follows: "Why should the escaped convict be entitled to more protection than while escaping. He cannot fall within the protection of those sections of The Code which are made for the benefit of those having a legal right to control their time and conduct before a conviction. No machinery of the law is provided for the cap-ture of an escaped felon under sentence. Warrants are provided for the arrest of the accused, to the end that the truth may be inquired into—

not for the convicted. After the conviction and sentence the felon has
no liberty. By his own wilful conduct he has forfeited it, and it has
been so adjudged." This position has the support of well-considered
cases in other jurisdictions and the authoritative text-books on the
subject are to like effect. *Pickelsimer v. Glazener,* 173 N. C., 630-635;
*S. v. Lingerfelt,* 109 N. C., 775; *Parker v. Bidwell,* 3 Conn., 84; *S. v.
Holmes,* 48 N. H., 377; *Commonwealth v. McGahey,* 77 Mass., 194;
*Taylor v. Tainter,* 83 U. S., 366-371; *Schwamble v. The Sheriff,* 22 Pa.
St., 18; *Leonard v. Rodda,* App. Ca. Dis. Co., 256; *Gano v. Hall,* 42
N. Y., 67; approving decision of *Clark v. Cleveland,* 6 Hill, 344; Rus-
sel on Crimes (9 Ed.), 586; Bishop's New Crim. Procedure (2d Ed.),
1189; 1 Chitty's Crim. Law, 61; 2 Hawkins P. C., 193; Clark's Crim.
Procedure, 38; 5 Cor. Juris, 436-437.

In several of the cases cited the court was dealing more directly with
the right of bail to assert these principles in civil suits and in which
the judges, upholding such right without warrant and wherever found,
likened it to the recognized power of an officer to rearrest an escaped
prisoner who had been lawfully committed to his keeping and control.
Thus, in *Taylor v. Tainter, supra, Associate Justice Swayne,* speaking
of this right of bail in such case, said: "Their dominion is a continu-
ance of the original imprisonment. Whenever they choose to do so,
they may seize and deliver him up in their own discharge, and if that
cannot be done at once, they may imprison him till it can. They may
exercise their rights in person or by agent. They may pursue him into
another State, arrest him on the Sabbath, and may break and enter his
house for the purpose. The seizure is not made by virtue of a new
process. None is needed. It is likened to the rearrest by the sheriff of
an escaping prisoner." And *Walker, J.,* in *Pickelsimer's case,* and
*Shepherd, J.,* in *S. v. Lingerfelt,* are to like effect. And a perusal of
these other authorities will disclose, as stated, that the right of a sheriff
or other officer to rearrest a prisoner who has been lawfully committed
to his keeping is not restricted to his own county, and while a distinction
is noted in some of the cases as to the rights of the officer in case of
*mesne* and final process in civil cases, there is none recognized in crim-
inal causes nor does it make any difference in these causes whether the
escape has been voluntary or negligent. We were referred by counsel
to some decisions to the contrary, notably *S. v. Endsley,* 122 Tenn., 647,
and *McCaslin v. McCord,* 116 Tenn., 693, which apparently proceed
upon the principle that an officer must have a warrant for the arrest
of an escaped prisoner except upon fresh pursuit. But, in our opinion,
the right was not so restricted at common law and, as heretofore stated,
we find nothing in our statutes which impairs or tends to impair the

STATE *v.* FINCH.

common-law principle. Thus, in Bishop's New Criminal Procedure it is said: "We have seen that an arresting officer may without fresh warrant recapture a prisoner who has broken away from him and so may the keeper of one imprisoned on sentence who escapes 'even,' says *Hale,* speaking of a felony, 'seven years after, though he was out of his view,' a doctrine which plainly is not different in a misdemeanor." In Russel on Crimes, 586, the principle is given as follows: "It seems to be clearly agreed by all of the books that an officer, making fresh pursuit after a prisoner who has escaped through his negligence, may retake him at any time afterwards whether he find him in the same or a different county, and it is said generally in some books that an officer who has negligently suffered a prisoner to escape may retake him whenever he finds him without mentioning any fresh pursuit, and indeed, since the liberty gained by the prisoner is wholly owing to his own wrong, there seems to be no reason why he should have any manner of advantage from it." A statement that is in exact accord with Chitty and Hawkins, and showing that these accurate authors give preference to the position that the right to rearrest of an escaped prisoner by an officer holding him under a lawful sentence is not dependent on instant pursuit but may be exercised at any time and at any place, at least where the sentence of the court has the effect of determining the status of the convict.

In support of his Honor's ruling, it is insisted for the State that, under sec. 2817 of the Revisal, the power of a sheriff and his lawful deputies is confined to the territory of their respective counties, and under the terms and general policy of this section the same limitation should be extended to general superintendent of convicts and all other county or local officials, a similar position as to constables appearing in Rev., sec. 937.

An examination of the statute, however, will show that the section in question simply enjoins upon the sheriff and his deputies the duty of serving all process or other writs which are especially addressed to them within the border of their counties; that there is nothing inhibitive in the law as to the power of the sheriffs, and neither in its terms or purpose does it apply nor is it intended to apply to a case like the present, where no additional process is required and where the sheriff or superintendent of a convict camp or other officer has the custody and control of a convicted criminal under a sentence and commitment of a competent court having full jurisdiction of the question. Again, it is contended that the sections of the Revisal appertaining to arrests without warrant, secs. 3176-3182, do not directly specify nor include a case like the present where the convict in question was under sentence only for a

misdemeanor and the officers of Johnston County were endeavoring to exercise the right of arrest in the county of Wake, but as pointed out by *Cooke, J.,* in case of *State v. Stancil,* these provisions contemplate and refer throughout to the arrest of persons accused of crime and before any hearing was had, and is in no way designed to regulate or restrict the power of an officer to pursue and recapture an escaped prisoner who has been especially committed to his keeping under judicial sentence and whom he is required to hold, in the proper performance of his official duty. In such case, not only is this right of arrest without warrant, in the same or a different county, in accord with the recognized principles of the common law, but, on reflection, it will appear that this right is necessary to a proper and adequate protection of the State's peace. These convict camps, having prisoners of different grades, whose sentence may be as high as ten years, in the course of their work are not infrequently on the borders of adjacent counties, and in case of a "general get-away," a case not at all unsupposable, it would present a deplorable condition if an officer was required to have a warrant to pursue and rearrest the escaped prisoners. Throughout the sections referred to a hearing is clearly contemplated and provided for, involving also the right of appeal, and so it might come about that a camp, composed of outlaws and convicted felons, could roam at will, to the constant and very real menace of law-abiding people while their cases were following the constitutional and statutory methods of criminal procedure. Nor can it be maintained that the right of arrest is barred or impaired in this case by reason of the evidence, which tends to show that the convict may have been absent at the time by the connivance or permission of the superintendent. Given his authority for the benefit of the public, a public officer having custody of a convicted criminal cannot estop or disqualify himself from acting at all times as the public interest may require in the performance of his official duties, and both reason and approved precedent are to the effect that it is his right and his duty to rearrest an escaped prisoner when and wherever he may be found, and whether the escape has been negligent or voluntary. This position is very satisfactorily discussed by *Justice Morris* in case of *Leonard v. Rodda,* 5th Appeal Cases, District of Columbia, *supra,* and in the opinion he refers with approval to a Pennsylvania decision on the subject as follows:

"In the case of *Schwamble v. Sheriff,* 22 Pa. St., 18, the Supreme Court of Pennsylvania said: 'In civil cases, if a party escapes who is in custody on *mesne* process, he may be retaken at any time before return day. If he is held on final process, the sheriff becomes absolutely liable for the debt and costs by suffering the prisoner to go at large,

and he cannot imprison him again. But a party who is in custody, accused or convicted of a criminal offense, whether he be in jail awaiting his trial or in execution of a sentence after trial, if he escapes he may be recaptured at any time afterwards, and this whether the escape was voluntary or involuntary on the part of the sheriff. It is well settled that one who has been detained for the nonpayment of a fine may be retaken by the very officer who consented to his escape. 6 Hill, 349; 1 Neil Gow's N. P. Cases, 99. It is no argument against this rule that an officer who permits the escape of a convicted criminal may be indicted as the criminal himself would be. The officer does not suffer instead of the criminal, but he is punished with him; and though it be according to the same measure, it is for a distinct offense.'" And *Ex parte Sherwood,* Tex. Civ. App., 15 S. W., 812, and *Simpson v. State* (Ark.), 19 S. W., 99, are to the same effect. On a proper consideration of these principles the defendant, summoned by the superintendent of convicts for the purpose, who was himself present, had a right to take part in this arrest, and this being true and in that aspect of the matter, we are of opinion that the evidence requires that the right of the defendant to maintain the position of a perfect self-defense should be submitted to the jury, and on the facts as they now appear and a correct application of the authorities cited, if the defendant, having called to the deceased to throw up his hands, shot and killed the deceased, shot wantonly and without giving him opportunity to obey his order, there would be nothing to rebut the presumption of malice which arises from the unlawful killing with a deadly weapon, and the defendant would be at least guilty of murder in the second degree; or second, if he shot and killed the deceased without malice but in the exercise of unnecessary force, he is guilty of the crime of manslaughter. Third. If he appeared at the door of the deceased's home at night and without announcing his authority or purpose and the deceased being ignorant of the same, he called to the deceased to throw up his hands and shot and killed him in the course of the difficulty so provoked, under the cases referred to he would be guilty of manslaughter, though at the precise time of the homicide the deceased may have made a demonstration as if to draw a deadly weapon. If, however, the defendant, acting on the summons of the superintendent, while engaged in the effort to arrest the deceased, an escaped convict, appeared at the door of the deceased, called to him to throw up his hands, and the latter, being aware of his purpose and authority, made a demonstration as if to draw a deadly weapon, and from all the facts and circumstances as they reasonably appeared to the defendant, in the judgment of the jury, it became necessary to kill the deceased to save himself from death or great bodily harm, in such case the defendant would be entitled to an acquittal.

For the error indicated there must be a new trial of the cause, and it is so ordered.

New trial.