Victoria Greer was tried under the following indictment: "The Jurors for the State Upon Their Oath Present, That Victoria Greer in Forsyth County, on the 11th day of May, 1940, wound one John Greer with a deadly weapon, to wit, a certain pistol; and with the intent to feloniously kill, and did inflict serious bodily injury to the great damage of the said John Greer contrary to the statute in such cases made and provided, and against the peace and dignity of the State."
John Greer, husband of the defendant, testified that he went to his stepbrother's house to pay his wife $4.50 alimony due that month under Judge Lipfert's order, as the result of an indictment for nonsupport prosecuted against him by his wife. His wife, he testified, did not have a receipt, and left the house. He gave the money to his stepbrother's wife. He returned that night and got the receipt from her, and met his wife as he went out, and she asked to speak to him. They sat on the "settee" and she said, "John, I am in love with you. Come on back and live with me." He declined, and she told him if he did not, "You ain't going to be so hot." When asked what she meant, she said, "If you don't come back, you'll find out."
Afterward, according to his testimony, he went out, and was in his brother's car. She followed him to the car and repeated her request for him to come back. "There were five or six people in my brother's car when I got in it. They were: Stacy McLaurin, Nancy McLaurin, and a girl named Jessie who was Nancy's sister, Eloise Bohannon, and Paul Anderson. I went back to my brother's house and parked the car. My brother's house is about seven blocks from where my brother-in-law lives, and is on Cherry Street. I went in the house and told my sister-in-law how my wife threatened me. She says, `There is nothing to that, just old love.' I thought nothing about it and sat there and talked a while. I went back out to the car. The people were still sitting in the car, never did get out. I was not drinking, and I never drank a drop of whiskey in my life. I sat in the car under the steering wheel for about five minutes and my wife walked up. This was about seven blocks from where I left her. She asked could she speak to me and I *Page 662 
said she could. I got out and we stood back of the car. I put my foot up on the bumper. She says, `John, aren't you going home with me?' I says, `No, I told you I wasn't.' She says, `John, I feel sorry for you.' I didn't know what she meant. She kept saying, `I feel sorry for you.' She would never say what she was going to do. I turned and went on and sat back in the car. She walked around beside the car, between the car and the house, and she pulled out a pistol. She says, `All you damned Negroes get out of that car.' Everybody jumped out of the car and ran. I sat there in the car. She had the gun on me, and there was nothing for me to do. I got out on the opposite side of the car in the street. The car was between me and her. She had the gun dead on me. She says, `Come out from behind the car or I will shoot through the car.' I circled behind the car. My brother at that time walked out of the door and called me. She looked at him and says, `Bus Greer, you ain't got nothing to do with this.' She throwed the gun up and says, `I am desperately in love with this man.' She kept chasing me around the car until I got tired of running around the car. She told me to come on out. I came on out from behind the car with my hands up. As I did, she had got the pistol leveled right dead in the middle of my stomach. She says, `Get up the street in front of me.' I had my hands up and I walked up the street in front of her. She had the gun close to me in my back. The pistol was not touching me but it was real close. I walked up the street scared to look back. I was looking for her to shoot me any minute. I walked just about fifty feet between Seventeenth Street and the intersection, and she shot me. I had on these same pants. When she shot, I run. She snapped the gun at my back three times I know of. I don't know how many more. The gun didn't go off no more. She struck out behind me and run me around down Seventeenth, around Twentieth and on back into Cherry again — ran me about two blocks. When I got up on Cherry Street, I don't know which way she went."
Further testimony of this witness was as to the nature of the wound and statement of his difficulty in living with her.
The witness was corroborated in the main aspects of his testimony as to the shooting by Eloise Bohannon and John Pardue, and J. R. Bowles, of the detective division of the police department, stated that he saw no marks on defendant that night at police headquarters; that she had told him that John grabbed her arm and that the gun went off accidentally.
Victoria Greer, the defendant, testified as follows: "I am the wife of John Greer, the prosecuting witness. I recall the afternoon before the shooting occurred that night. My husband and I had been over to Squire Adams' office that day. It was after two o'clock that we left *Page 663 
there. After I had been home for an hour or more, my husband came to my home. He stopped at the house and came in and told me to write him a receipt. As I went to get the receipt in the bottom of the vanity drawer, this man strikes me across the head and knocks me to the floor and began beating me and kicking me and said, `I asked you to take the nonsupport down and you didn't do it and I am not going to pay it. And if I do pay it, you are not going to reap the benefit of it because you will have to pay it out for doctor's bills.' He severely beat me there and forced me to drink something — I don't know what it was — and then told me if I would have him up what he would do to me and he left the house without even paying it. I did not go to a doctor just then. I did go to Dr. Jordan and he examined me. I went there several times, and also went to the hospital. After my husband whipped me that afternoon in my house, I next saw him that night. I don't know what time it was, but they say it was around ten o'clock. I went down to Mrs. Brockman's and was there talking to her and I went next door to see her aunty. When I came back to my home, John Greer was in the house standing in the front room near the center of the floor in the dark and as soon as I walked in the house, he began to argue with me about having him up, said I had taken out a warrant for him. I told him I hadn't taken out a warrant for him. He says, `Oh, yes, you have.' I says, `What's the matter with you today? You beat me up, it looks like you ought to be satisfied.' I sat down on the davenport and tried to explain to him. He had his hand in his left pocket. I asked him what he was doing with his hand in his pocket. Just as I said that, he jerked his hand out of his pocket with a short pistol in it. I knocked it out of his hands and run with it. I started down the steps and told him I was going to report the gun to police headquarters. He says, `You are not; that is not my gun, it belongs to a girl.' As I run up the street, he passed me about middle ways of the block. I don't know which way he went. I tried to make it to my mother's house. This car drove up almost at Seventeenth and Cherry and someone says, `There she is now.' As I walked about two or three steps, he parked the car and jumped out. He started arguing with me, swearing at me and telling me to give him the gun. I told him I wasn't going to give him the gun and was going to report the gun. He made advances toward me. By me being scared, and beat up, and excited, I put the gun up to protect myself just as he made a lunge toward me. When I threw the pistol up, he wheeled and that is when I squeezed the lemon squeezer and it pierced him in the side. I don't know what size pistol it was, but it was very short. I had it in my left hand and had a small pocketbook in my right hand. After this pistol exploded, I had two gashes cut on this left hand, and powder on the inside, kind of a scorched *Page 664 
place on the inside of my left hand. I bled. I had my hat and some of the blood is still on the hat. When the gun went off, it frightened me so bad I dropped the gun and run. I went down Seventeenth Street until I got to a little bridge, went across the bridge and came back to Cherry. I went down Cherry to the Old Town Road, across it, down to Thirteenth Street, crossed the Boulevard and went up Abattoir Street and into Trade Street. The police did not have to catch me; I gave up and told them what happened as best I could. Later on I was released on bond. I had never shot a pistol before and had never seen that pistol before that night. I don't know what became of the pistol. I dropped it there in the street and that is the last time I saw it. My husband said the pistol belonged to a girl by the name of Nancy B. that he was out with. That is Nancy McLaurin. My husband has beat me so many times, I haven't the slightest idea how many. It is more times than I even have fingers."
"He came to my house and beat me up that afternoon. That night I went down to his sister-in-law's. O. Z. Brockman is his stepbrother. I saw him there. I was alone when he came to my house in the daytime. Nobody saw him there but me. When I went down to O. Z. Brockman's Mrs. Brockman was there when he came in with this gun, but she was in the back room in the bed. I went next door to see Miss Rachael, her aunty. When I came back is when this man was in the house. He was at his stepbrother's house. I went in and we sat down on the davenport in the Brockman house. Mrs. Brockman was in the next room in the bed. He pulled out a pistol. I didn't holler. I weigh about 110 pounds. He weighed about 170 the last time I knew. When he came out with the pistol, I took it away from him by knocking it out of his hand and picking it up. I ran. I went out in front of him and went down the steps and up Twenty-Third Street. I lived on Twenty-Third Street. I was not especially going to the corner of Seventeenth and Cherry. I was going to try to make it over to my mother's to report this gun. I wanted my mother to go with me to police headquarters. I didn't report it to Mrs. Brockman because I was afraid he might catch me. He got in the automobile and passed me while I was still on Twenty-Third Street. There was no use to go back to Mrs. Brockman's because police headquarters is the place to go for things like that. My mother lived right behind the Children's Home at that time. To go on out Twenty-Third toward there you have to go by a graveyard to get to Twentieth and I was afraid. I never went that way to mother's. My mother lives on Glenn Avenue Extension. I always go down Cherry and get on Glenn Avenue Extension. I couldn't have gone out Twenty-Third." *Page 665 
She was corroborated, in part, by Nina Blanton, who testified: "I am the mother of Victoria Greer and I recall this Saturday night this shooting occurred. She came to my house after she had gone to police headquarters. I asked her how did she get a gun and whose gun it was and she told me she was down at Mr. Brockman's house and John was there and that she and him was arguing, sitting on the davenport, and she noticed him all the time with his hand in his left pocket. She said she asked him what it was or something, and he pulled his left hand out of his pocket and had this little pistol in it. She said she knocked it out of his hand and got it and run with it. She said she was on the way to headquarters to turn the gun in and she come in contract with him and was afraid he was going to finish her and through the excitement she shot him. I saw her body bruised up that Sunday morning. She had been beat with a stick, because the skin was all broken. I put white vaseline on her body myself. She was severely beaten by him. This was around five o'clock in the morning when I saturated her body with white vaseline. John came to my house on either Thursday or Friday afternoon before this thing happened. He was asking me to make her take this nonsupport down. I told him I couldn't. I says, `If it was me, I would do it. It would have been down long ago.' He says, `If you want her, you better make her take it down.' `I am going to have it took down and no judge won't have to take it down.' I told my daughter what he said. She told me she went down some time during the week-end and tried to take it down."
Dr. J. C. Jordan, admitted to be an expert physician and surgeon, testified for the defense:
"I am a regular practicing physician here in the city and have been here six years. I treated Victoria Greer, I saw her first on 5-16-40. She came to me with the following complaint: `My husband beat me about two months ago. Three weeks ago he kicked me. Then last Saturday he took my clothes off and beat me with his fists and a stick.' I had Victoria to disrobe in the office and examined her. I saw numerous whelps over her body and made an attempt to locate most of the whelps, which I found on her body. The locations were as follows: She had seven whelps in the upper left chest in the front. Twenty-seven on the left side from the crest of the ilium, the top of the pelvis to the shoulder. She had five in the upper center back. Seventeen on the right side. Twenty on the right buttox and leg and had a pulled tendon at the height of the tenth rib on the right side and the left shoulder blade was tender. On 5-22-40 I got word that the patient was so weak I had to hospitalize her. I placed her in the hospital that day and she was discharged from the hospital on 6-3-40 and I reexamined her. I have an opinion satisfactory to myself as to what caused the pulled *Page 666 
tendon. I think that the pulled tendon which she had at the level of the tenth rib on the right was due to some blow which she had received at that point. When she first came to see me her physical condition was multiple abrasions of the entire body. As I continued to see the patient she developed a mental condition and I made a diagnosis of catamania. The patient was unable to take any food by mouth in any form. I sent the patient to the hospital because she couldn't eat. She didn't eat for two days, from 5-22-40 to 5-24-40. There was absolutely no way to keep the patient alive unless she ate and I felt hospital feeding by vein was the only way in which to keep her alive. I didn't send her to the hospital because of having heard she had taken some poison. I heard that, but there was no evidence of it that I found."
The jury found the defendant guilty of an assault with a deadly weapon, with intent to kill. The sentence was a period of not less than two nor more than three years in State's Prison. The defendant appealed.
Under the evidence in this case, was it the duty of the trial judge, without special request therefor, to instruct the jury upon the law of self-defense? We answer in the affirmative. C. S., 564; S. v. Thornton,211 N.C. 413, 190 S.E. 758; S. v. Bost, 192 N.C. 1, 133 S.E. 176; S. v.Godwin, 211 N.C. 419, 190 S.E. 761.
The evidence was, of course, contradictory. But with this fact neither the trial court nor this Court has any concern in applying the principles of law involved. Indeed, upon appropriate instruction, the jury may have found the testimony relied upon by the State less credible than that of the defendant. On a matter of this kind, at least, the statement of the defendant must be accepted as true. S. v. Finch, 177 N.C. 599, 600,99 S.E. 409.
There is much evidence in the record which should be considered upon the question of self-defense other than the immediate account which lifts the curtain upon the assault — the occurrences immediately preceding the meeting; the disparity in the size and strength of the parties, Greer weighed 170 pounds, the defendant was a frail woman weighing 110 pounds; the fact that he had previously beaten her almost to death, and renewed the beating that very day; the statement that if she did not "take down the alimony" she would have to pay it out in hospital bills; the fact that she was on her way to give his pistol to the police; the fact that his inhuman beatings had instilled into her uncontrollable fear, and *Page 667 
had rendered her mental reactions abnormal — all these considered in connection with her version of the encounter: "I tried to make it to my mother's house. This car drove up almost at Seventeenth and Cherry and someone says, `They she is now.' As I walked about two or three steps, he parked the car and jumped out. He started arguing with me, swearing at me and telling me to give him the gun. I told him I wasn't going to give him the gun and was going to report the gun. He made advances toward me. By me being scared, and beat up, and excited, I put the gun up to protect myself just as he made a lunge toward me. When I threw the pistol up, he wheeled and that is when I squeezed the lemon squeezer and it pierced him in the side. I don't know what size pistol it was, but it was very short."
There is in this evidence an inference of self-defense which is not canceled out by the contradictory evidence of the State, even her own declaration to others that the actual shooting was accidental. In her own evidence she attributed it to a fear which neither humanity nor reason may disallow, and of which the law itself is considerate. Taking all the evidence together, the inference that defendant acted under a reasonable apprehension of great bodily harm cannot be said to be based on a mere scintilla.
There was error in failing to instruct the jury on the law of self-defense in connection with defendant's evidence, and she is entitled to a new trial. It is so ordered.
New trial.