STATE v. VERNIE HIPP.

(Filed 12 December, 1956.)

1. **Homicide § 11—**

> A defendant may set up self-defense under a plea of not guilty to a charge of murder.

2. **Homicide § 27f—Evidence held to raise question of self-defense for consideration of jury.**

> Defendant's evidence was to the effect that her husband had made repeated threats against her life, that on the occasion in question she was awakened by an assault committed by him, that he got a rifle, pointed it at her heart and threatened to kill her, struck her on the side of the head, and that when she realized what had happened, he was on the floor dead. The evidence further tended to show that the deceased was a heavy, strong man and defendant a frail woman. There was also testimony of other statements made by her not consonant with the theory of self-defense. *Held:* The evidence raises the question of self-defense, notwithstanding contradictory evidence of the State or even defendant's own declarations; and it was prejudicial error for the trial court to fail to submit the question to the jury under appropriate instructions.

3. **Criminal Law § 51—**

> It is the function of the jury, not the court, to determine the credibility of the testimony.

JOHNSON, J., not sitting.

APPEAL by defendant from *Fountain, S. J.,* March, 1956 Term, LEE Superior Court.

Criminal prosecution upon an indictment charging the defendant with the crime of murder in the first degree in the killing of her husband, Clayton Hipp. Upon arraignment the solicitor announced in open court he would not ask for a verdict of guilty of murder in the first degree, but for murder in the second degree or manslaughter.

The State offered evidence tending to show the following: The deceased and the defendant were husband and wife. They lived in the City of Sanford. They had a son, John Wayne, 16 years of age, who, at the time of the homicide was not at home. At about eight o'clock on Sunday evening, 18 July, 1954, the defendant called the police department over the telephone and said to Officer Ferguson, "Policeman, come over to my house. I have shot my husband and killed him. Bring the coroner." Officers Ferguson and Eatmon arrived at the apartment in about five minutes. The defendant was standing in front of a chair. The body of the deceased was slumped down on his knees beside a couch with his right hand on the couch. A cigarette in the fingers of his right hand was still burning. Lying against the chair was

a .22 calibre auto-loading (erroneously called automatic) rifle. When asked what happened, the defendant replied that she had shot Clayton, that she aimed at his heart. She said he had loaded the rifle, given it to her and "told her she was a damn liar and a s.o.b. if she didn't shoot him." She said she shot him five times, twice in the chest and three times after he fell. Examination disclosed two bullet wounds in the chest and three in the back.

On cross-examination, the officer testified the defendant was drinking. She said she was tired of taking his beatings; that he had hit her and put a lot of bruises on her, numbers of times, and she was getting tired of taking it. The officers saw bruises on her neck, arm and chest and, "We had had reports he had been beating her. We had been around there a number of times before when she had bruises." The deceased was "a little on the stocky build, weighing about 175 pounds." The defendant "was more or less frail in appearance."

The defendant testified in her own behalf as follows: "On Thursday night before Sunday, he drew a butcher knife on my back. . . . We . . . started to go to bed . . . When I looked back, he had a butcher knife and was fixing to stab me in the back. I looked up at him. I said, 'Clayton, what do you mean?' He dropped his hand and he just froze. He didn't speak for a few minutes, turned and went back to the kitchen and put the knife up. He never mentioned the knife any more and I didn't either.

". . . on Sunday (the day of the homicide) my husband was home part of the day. He was there from 2:30 Sunday morning until 12 or one o'clock Sunday evening. . . . The next time I saw him was when he awakened me on Sunday evening. I had not been out of the house. . . . When he woke me up he was twisting my leg and cursing me and fighting me. I managed to get away from him and get on the opposite side of the bed and tried to get out of the room. He chased me, was still fighting me with his hands. He hit me over the face and neck, twisted my arm. I was trying to get out, begging him to lie down and let me go to Mama's. . . . I was trying to get to the door because he was pretty drunk. I figured if I could get to the outside door I could get out, . . . He was drunk, and all the time he was fighting I was trying to get away. . . . He said he was going out to get John Wayne and that he was going to beat hell out of him. When he started out the door he told me, 'If you stick your head out the door while I am gone, I will pull every hair of your head out and choke you to death.' . . . I thought that would be my break. I thought he would go, but he came and sat in the corner; he picked his gun up; he cursed me again and said, 'No, I am going to kill you right now, and get John Wayne later.' He picked up the gun and checked the ejector, a bullet fell out. He came towards me with the gun, still cursing, and the gun pointed

toward my heart, and the last word I spoke to him, I said, 'Please put the gun away.' That is when he struck me up the side of the head, with what, I don't know, and I don't know what happened; how the gun got in my hand or out of my hand, but I was stunned for awhile. When I came to he was lying slumped over the couch with his left arm over the couch and the rest of him on the floor. . . . I reached back and picked up the telephone and I called the police station. . . . I was afraid of my husband at that time. I was scared of him because he was all man. He could fight. . . . I don't know why I shot him because I never had in my mind to shoot him or anybody else. He had taken the gun down and threatened to use it on me before, several times."

The jury returned a verdict of guilty of manslaughter. From a judgment that the defendant be confined in the quarters provided for women at the State's Prison for a term of not less than eight nor more than 12 years, the defendant appealed.

*George B. Patton, Attorney General, and Harry W. McGalliard, Asst. Attorney General, for the State.*
*S. Ray Byerly and Gavin, Jackson & Gavin for defendant, appellant.*

HIGGINS, J. The defendant's plea of not guilty placed upon the State the burden of proving her guilt beyond a reasonable doubt. The plea permitted her to justify the killing, if she could, by showing the act was done in self-defense. The evidence for the State was sufficient to go to the jury on the charge of murder in the second degree, but did it not also raise the question of self-defense?

The State introduced the defendant's admission as evidence in the case. The defendant told her story from the stand. That, too, was evidence in the case. Boiled down to its essentials, her evidence paints this picture: The deceased, a strong man, had assaulted and beaten her repeatedly. Three days before the homicide he had a butcher knife at her back. On the fatal day he threatened to pull every hair in her head out and choke her to death. Upon his return after being gone for a few hours, he began an assault on her while she was asleep. She tried unsuccessfully to get away from him and to go to her mother's, but after twisting her arm and choking her, he got the rifle, threatened to kill her, and pointed the gun at her heart. He struck her on the side of the head, stunned her, and when she realized what had happened, he was on the floor, dead. She called the officers.

It is neither the function of the trial court nor of this Court to say whether the defendant's story is true or false. That is the jury's function. "There is in this evidence an inference of self-defense which is not cancelled out by the contradictory evidence of the State, even her own declarations to others that the actual shooting was accidental. In

her own evidence she attributed it to a fear, which neither humanity nor reason may disallow, and of which the law itself is considerate. Taking all the evidence together, the inference that the defendant acted under a reasonable apprehension of great bodily harm cannot be said to be based on a mere scintilla." *S. v. Greer,* 218 N.C. 660, 12 S.E. 2d 238.

If the defendant's story is to be believed, she was not at fault in bringing on the difficulty. Therefore, the door to the sanctuary of self-defense was not closed to her. Even though a frail woman, her natural reaction to an assault would be to defend herself. The instinct of self-preservation is strong in most creatures of this earth. Even a mouse will bite the hand that squeezes it. The question of self-defense arises on this evidence and only the jury can answer it. The circumstances under which one may fight and, if necessary, kill in self-defense are clearly set forth in an opinion by the present *Chief Justice* in the case of *S. v. Robinson,* 213 N.C. 273, 195 S.E. 824.

The learned trial judge charged the jury: "Because of remarks made by counsel in the arguments, I instruct you, gentlemen, that there is no evidence of self-defense in this case. There is no evidence of a justifiable shooting or killing of Clayton Hipp." The instruction is the basis of defendant's Exception No. 40 and is preserved by Assignment of Error No. 13. The exception is well taken. It was the duty of the trial court to submit to the jury the question of self-defense under proper instructions. For the error in failing to do so, the defendant is entitled to a

New trial.

JOHNSON, J., not sitting.