STATE OF NORTH CAROLINA v. HAROLD LEGUSTA WATKINS

No. 53

(Filed 1 June 1973)

1. Criminal Law §§ 120, 135, 138— imposition of punishment — role of judge and jury

The rule that the presiding judge fixes the punishment for a convicted defendant within the limits provided by the applicable statute and therefore the amount of punishment which a verdict of guilty will empower the judge to impose is totally irrelevant to the issue of a defendant's guilt and of no concern to the jurors is now applicable in all cases without exception, including capital cases because juries in this State no longer have the discretionary power to reduce the penalty in capital cases from death to life imprisonment.

2. Criminal Law § 87— leading questions allowed — no error

The trial court did not abuse its discretion in allowing the solicitor to ask leading questions where the four questions involved did not necessarily suggest the answer desired although all of them could have been answered yes or no.

3. Homicide § 28— failure to instruct on self-defense — no error

Defendant was not entitled to an instruction on self-defense where his evidence tended to show that he approached the unarmed deceased with a shotgun, deceased lunged at him and defendant "throwed the gun up . . . and it shot"; nor did the State's evidence require such an instruction where it tended to show that defendant walked up to the deceased, said "Say what you said before," then raised the gun and shot him before deceased could say anything else.

4. Constitutional Law § 35; Criminal Law § 135— first degree murder — mandatory death penalty not applicable

The mandatory death penalty for murder in the first degree, rape, burglary in the first degree and arson may not be constitutionally applied to any offense committed prior to 18 January 1973, the date *State v. Waddell* was handed down; therefore, since the murder for which defendant was convicted occurred on 24 February 1972, the mandatory death penalty cannot be applied and the case is remanded for imposition of sentence of life imprisonment.

DEFENDANT appeals from judgment of *Martin, J.,* 13 November 1972 Session, RICHMOND Superior Court.

Defendant was tried upon a bill of indictment, proper in form, charging him with the murder of Lee Edward Ingram on 24 February 1972.

The State's evidence tends to show that defendant worked in Aberdeen on 24 February 1972 and returned to Rockingham about 5:30 p.m. Around 9 p.m. he left Potts' Pool Room on East Washington Street in Rockingham in company with James Malloy and Alfred Steele. They drove to the Philadelphia section which is about five miles from East Washington Street. There defendant redeemed a 12-gauge single-barreled shotgun which he and his uncle had previously pawned to Mrs. Maude Dennis. Defendant and his companions then returned to East Washington Street. Defendant alighted and his companions drove on about fifty feet to park the car. "About a minute after we let the defendant out of the car, I heard a shot. At that time we were getting out of the truck. . . . When I got out of the truck, I saw somebody laying in the street, but I did not know who it was. He was about 50 or 60 feet away."

Cassie Belle Staton testified that she was in the vicinity of East Washington Street around 10 p.m. and had seen Lee Edward Ingram, the deceased, come out of the pool room about 9:30 p.m. and get in a car occupied by Mrs. Imogene McDonald. He stayed in the car awhile and was getting out of it when defendant approached with a shotgun in his hand and said, "I got you now." With gun in hand, defendant kept repeating, "Say what you said before; say it now." Ingram replied, "Man, what are you talking about?" Defendant said, "Come on now; why don't you say it now?" Before Ingram said anything else defendant threw up the gun and shot him in the face. Ingram died on the spot. Defendant went into Potts' Pool Room, reloading the gun as he went.

Policeman Jasper Christmas arrived on the scene within five minutes and found Ingram lying on the street five or six feet from Potts' Pool Hall. He examined the body, found part of the head blown off, and determined that Lee Edward Ingram was dead.

Defendant testified as a witness in his own behalf. He said he was twenty-one years of age, married but not living with his wife. He was casually acquainted with Lee Edward

Ingram and knew he went by the name of "Mule" Ingram. He first heard about Ingram in September 1971. At that time Ingram was with defendant's wife, and as she left to go with defendant Mule Ingram "told me I had better not hit her." He saw Ingram again in December 1971 in company with one Herman Baldwin when Baldwin fired a gun toward defendant's house. Defendant testified he had been informed by his brother that Mule Ingram, Herman Baldwin and Bo Didley were looking for him; that Mule was "cursing and going on" and had a gun; "that Mule was the one that wanted to fight, and that Mule was pushing [putting] Herman up to fight me."

Defendant testified that he weighs 133 pounds and is 5 feet 9 inches tall, and that Mule Ingram weighed about twenty pounds more and was about two inches taller. On 24 February 1972 defendant worked in Aberdeen, returned to Rockingham after getting off work, and went to Quick's Grill where he drank some beer and wine. He then went to the pool room where he saw several people including Mule Ingram. He heard Mule Ingram say, "Damn—that damn ass is here now." After hearing this, defendant left the pool room and got James Malloy to take him to get the shotgun, intending to talk to Ingram. "I figured that was the only way I could talk to him to keep him away from me, to leave me alone." Defendant further testified that he had given Ingram no reason to call him a damn ass. He went to Maudie's Place and got a shotgun his uncle had pawned there and returned, figuring that "if they seen me with the gun . . . I would have a better chance to talk with him and tell him to leave me alone." When he got back to the East Washington Street area defendant got out of the truck and crossed the street to the sidewalk with the gun in his right hand, the barrel pointed downward. He saw Ingram standing facing the McDonald car, walked toward him, stopped five or six feet from him, and called his name. When Ingram turned to face him, defendant said, "Mule, why do you and Herman want to fight me, man?" Ingram threw his arms up and said, "Man, I don't mean no harm—we don't mean no harm," but was coming toward defendant while making that statement; "and right after he said that he just made a jump, a lunge at me." When Ingram made the lunge he was about an arm's length away, and defendant "throwed the gun up and it shot."

Defendant said he did not recall pulling the trigger and meant only to scare Ingram to keep him off. He testified that

he entered the pool room and a man named Rush told him he had better run, whereupon he threw the gun down and ran. He said he never ejected the spent shell from the chamber and never reloaded the gun. He stated that he believed Ingram had a knife at the time but that he did not intend to kill Ingram. He denied saying to Ingram: "Say again what you said before, say it now, man."

Numerous witnesses testified that they had known defendant all of his life and that his general reputation was good.

Albert McDonald, a rebuttal witness for the State, testified that he was in Potts' Pool Room about ten o'clock when he heard the shot; that defendant came in and asked for Herman Baldwin "and said he was going to kill that son-of-a-bitch too"; that somebody said "Here comes the police," and defendant ran toward the back door, threw the shotgun in the bathroom, and ran out.

Mrs. Imogene McDonald testified that she talked with Lee Edward Ingram, the deceased, while her husband was in the pool room; that Ingram was sitting in her car, and when he opened the door to get out the defendant approached and said, "Say it now what you said before"; that Ingram then got out of the car and was turning around as he put his hand up and said, "Hold it, man, hold it," and defendant shot him; that they were three to six feet apart; that defendant then went into the pool room; that Mule Ingram was her first cousin.

Defendant's motion for judgment of nonsuit at the close of all the evidence was denied. The jury convicted defendant of murder in the first degree and recommended mercy. Defendant appeals from a sentence of death by asphyxiation, assigning errors discussed in the opinion.

*Joseph G. Davis, Jr., Attorney for defendant appellant.*

*Robert Morgan, Attorney General, and Howard P. Satisky, Assistant Attorney General, for the State of North Carolina.*

HUSKINS, Justice.

The failure of the trial judge to inform the jury that a conviction of murder in the first degree would result in a mandatory sentence of death constitutes defendant's first assignment of error.

State v. Watkins

The jury returned a verdict of guilty of murder in the first degree with recommendation of mercy. Defendant contends that had the jury known a sentence of death would be pronounced notwithstanding the mercy recommendation it would not have convicted him of murder in the first degree.

For reasons hereinafter stated, the death sentence pronounced in this case must be vacated and a life sentence pronounced in lieu thereof. In light of that fact, this assignment is overruled without discussion.

[1] The propriety of informing the jury of the amount of punishment which a verdict of guilty will empower or require the judge to impose was explored in depth by Justice Sharp, writing for the Court, in *State v. Rhodes,* 275 N.C. 584, 169 S.E. 2d 846 (1969). The rule is stated in the following quotation from that case:

> "In this jurisdiction, except in one class of cases, the presiding judge fixes the punishment for a convicted defendant within the limits provided by the applicable statute. The exception is capital cases in which the jury may reduce the penalty from death to life imprisonment. G.S. 14-17 (murder in the first degree) ; G.S. 14-21 (rape) ; G.S. 14-52 (burglary in the first degree) ; G.S. 14-58 (arson). In all other instances, the jury has performed its function and discharged its duty when it returns its verdict of guilty or not guilty. [Citations omitted.]

> "The amount of punishment which a verdict of guilty will empower the judge to impose is totally irrelevant to the issue of a defendant's guilt. It is, therefore, no concern of the jurors."

Since 18 January 1973, the law enunciated in *Rhodes* has become, and is now, applicable in all cases without exception, including capital cases, because juries in this State no longer have the discretionary power to reduce the penalty in capital cases from death to life imprisonment. *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (decided 18 January 1973).

[2] Defendant contends the court erred in allowing the solicitor to propound leading questions. His second assignment is based on exceptions to the following questions:

1. "Did you see the defendant, Harold Legusta Watkins, about that time?"

2. "Was Ingram doing anything at all to Watkins at this time?"

3. "At the time he shot Lee Edward Ingram, was Lee Edward Ingram doing anything at all to Watkins?"

4. "Did you see him load it again?"

These questions do not necessarily suggest the answer desired although all of them could be answered yes or no. Be that as it may, "[t]he allowance of leading questions is a matter entirely within the discretion of the trial judge, and his rulings will not be reviewed on appeal, at least in the absence of a showing of abuse of discretion." Stansbury, *N. C. Evidence* § 31 (2d ed. 1963) ; *State v. Frazier,* 280 N.C. 181, 185 S.E. 2d 652 (1972) ; *State v. Harris,* 222 N.C. 157, 22 S.E. 2d 229 (1942) ; *State v. Buck,* 191 N.C. 528, 132 S.E. 151 (1926). No abuse of discretion is shown and no prejudice to defendant is discernible. Defendant's second assignment is therefore overruled.

Defendant's third assignment of error is grounded on the failure of the court to instruct the jury on the right of self-defense.

Where the evidence is insufficient to invoke the doctrine of self-defense, the trial judge is not required to instruct the jury thereon. *State v. Freeman,* 275 N.C. 662, 170 S.E. 2d 461 (1969) ; *State v. McLawhorn,* 270 N.C. 622, 155 S.E. 2d 198 (1967) ; *State v. Chavis,* 80 N.C. 353 (1879). Indeed, it would be error to do so. *State v. Johnson,* 278 N.C. 252, 179 S.E. 2d 429 (1971).

On the other hand, where defendant's evidence is sufficient to warrant a charge on self-defense, the instruction must be given even though the State's evidence is contradictory. *State v. Hipp,* 245 N.C. 205, 95 S.E. 2d 452 (1956) ; *State v. Greer,* 218 N.C. 660, 12 S.E. 2d 238 (1940). In resolving this question the facts are to be interpreted in the light most favorable to defendant. *State v. Finch,* 177 N.C. 599, 99 S.E. 409 (1919). No special prayer for the instruction need be given. *State v. Todd,* 264 N.C. 524, 142 S.E. 2d 154 (1965) ; *State v. Wagoner,* 249 N.C. 637, 107 S.E. 2d 83 (1959).

[3] Applying the foregoing principles, we hold that the evidence when considered in the light most favorable to defendant did not warrant an instruction on self-defense. In essence,

defendant testified that he went after the shotgun so he could discuss the apparent enmity of deceased toward him on an equal basis and without fearing for his own safety. "I figured if I had a gun, I would have a better chance to talk with him and tell him to leave me alone, than without it." He alighted from the truck with gun in hand and crossed the street to the sidewalk on the other side with the gun pointed toward the ground. He saw deceased, walked toward him, stopped five or six feet from him, and called his name. Deceased turned and faced defendant. Defendant said, "Mule, why do you and Herman want to fight me, man?" Deceased then started walking toward defendant with his hands in his back pockets. He threw up his arms and said, "Man I don't mean no harm—we don't mean no harm." Immediately after making that statement he lunged at defendant with arms outstretched. At that moment the shotgun was still pointed toward the ground, but after the lunge, "I throwed the gun up . . . and it shot. I don't know for sure if I pulled the trigger, I didn't mean to pull the trigger, I meant to scare him to keep him back off of me." Defendant saw no weapon in possession of the deceased and none was found upon his body.

At most, defendant's testimony makes out a non-felonious assault upon defendant by deceased. Assuming the truth of such evidence, it afforded defendant no legal basis for the intentional use of deadly force under the guise of self-defense. The law does not sanction the use of deadly force to repel simple assaults. *State v. Ellerbe*, 223 N.C. 770, 28 S.E. 2d 519 (1944) ; *State v. Dills*, 196 N.C. 457, 146 S.E. 1 (1929).

Nor does the State's evidence show self-defense. The State's witness Staton testified that defendant walked up to the deceased, said "Say what you said before," then raised the gun and shot him before Ingram said anything else. The State's witness Mrs. McDonald testified that "the defendant came up. Ingram was getting ready to turn around when the defendant says, 'Say it now what you said before,' and Ingram got out of the car, and he was turning around; and he put his hand up and said, 'Hold it, man, hold it,' and the defendant shot him."

Thus, the State's evidence shows defendant shot deceased in cold blood, without provocation, under circumstances in which no reasonable man would have felt any apprehension of great bodily harm. Such evidence affords no basis whatsoever

State v. Watkins

for an instruction on self-defense. *See State v. Johnson, supra* (278 N.C. 252, 179 S.E. 2d 429).

One who is an aggressor, or one who enters a fight voluntarily without lawful excuse, may not plead self-defense when he slays his adversary. *State v. Randolph*, 228 N.C. 228, 45 S.E. 2d 132 (1947). "The right of self-defense is available only to a person who is without fault, and if a person voluntarily, that is, aggressively and willingly, without legal provocation or excuse, enters into a fight, he cannot invoke the doctrine of self-defense unless he first abandons the fight and withdraws from it and gives notice to his adversary that he has done so." *State v. Davis*, 225 N.C. 117, 33 S.E. 2d 623 (1945). *Accord, State v. Johnson, supra* (278 N.C. 252, 179 S.E. 2d 429); *State v. Church*, 229 N.C. 718, 51 S.E. 2d 345 (1949). Thus the trial court correctly refrained from charging on self-defense. The evidence was sufficient to invoke the theory of accident, and the court properly presented that phase of the matter to the jury. Defendant's third assignment of error is overruled.

Defendant's fourth and fifth assignments of error relating to the failure of the court to charge on voluntary manslaughter and relating to acceptance of an allegedly improper verdict are overruled without discussion. See *State v. Freeman*, 275 N.C. 662, 170 S.E. 2d 461 (1969); *State v. Baldwin*, 276 N.C. 690, 174 S.E. 2d 526 (1970).

Finally, defendant assigns as error the death sentence pronounced in this case. For the reasons which follow, this assignment is good.

[4] The decision of this Court in *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19 (decided 18 January 1973), judicially severed the unconstitutional discretionary proviso from G.S. 14-17 (and other statutes relating to capital crimes) and left standing the remainder of each statute as the only valid expression of the legislative intent, with death as the mandatory punishment for murder in the first degree, rape, burglary in the first degree and arson. The effect of that severance was to change the penalty for first degree murder, and the other capital crimes, from *death or life imprisonment in the discretion of the jury* to *mandatory death*. We regarded the change as an unforeseeable judicial enlargement of the penalty for the four capital crimes in this State and held that the enlarged penalty, *i.e.*, mandatory death, could not be constitutionally applied *ex post facto*. For

State v. Watkins

that reason, *Waddell* specifically holds that the mandatory death penalty for murder in the first degree, rape, burglary in the first degree and arson may not be constitutionally applied to any offense committed prior to 18 January 1973, the date *Waddell* was handed down. Therefore, since the murder of Lee Edward Ingram, for which defendant was convicted, occurred on 24 February 1972, the mandatory death penalty cannot be applied.

Accordingly, the judgment of the Superior Court of Richmond County insofar as it imposed the death penalty upon this defendant is reversed. The case is remanded to the Superior Court of Richmond County with directions to proceed as follows:

1. The presiding judge of the Superior Court of Richmond County will cause to be served on the defendant, Harold Legusta Watkins, and on his counsel of record, notice to appear during a session of said Superior Court at a designated time, not less than ten days from the date of the notice, at which time, in open court, the defendant, Harold Legusta Watkins, being present in person and being represented by his counsel, the presiding judge, based on the verdict of guilty of murder in the first degree with recommendation of mercy returned by the jury at the trial of this case at the November 13, 1972 Session, will pronounce judgment that the defendant, Harold Legusta Watkins, be imprisoned for life in the State's prison.

2. The presiding judge of the Superior Court of Richmond County will issue a writ of habeas corpus to the official having custody of the defendant, Harold Legusta Watkins, to produce him in open court at the time and for the purpose of being present when the judgment imposing life imprisonment is pronounced.

Remanded for judgment.