The defendant was tried upon a charge of murder at March Term, 1941, of Wilkes Superior Court, and was convicted of murder in the second degree and sentenced to the State Prison for not less than ten nor more than fifteen years. That portion of the evidence pertinent to this decision may be summarized as follows:
The defendant was living with his wife, who was a daughter of Zack Lankford, at the latter's home. The evidence tends to show that Lankford told him he might come there and stay until he got a job and that his wife, Maude, could wait on her mother and be a help to her. Absher promised not to drink or give trouble and to make his children mind. There were several other members of the Lankford household, including Lon Lankford, Sam Lankford, Bryce Lankford, and the deceased, Leonard Lankford, all sons of Zack Lankford and brothers-in-law of the defendant.
On the day of the homicide, according to the testimony of Mrs. Zack Lankford, Leonard, the deceased, came in and was eating supper, and the defendant came in and called Leonard out somewhere and talked *Page 127 
with him. She further testified that Absher came in and started an argument with her youngest boy, Don. She then ordered him out, whereupon he told her that he was "going to get your little son, Brycie," a child about fifteen or sixteen years old; that defendant had a grudge against Brycie because the latter was "fast-spoken." Mrs. Lankford then struck him about three licks with a little whip she kept "to whip the young-uns with," and told him to leave, and he backed off to the kitchen door and went into the kitchen. Lon Lankford and Sam Lankford heard the controversy, came in and said, "Hort, you get out of here. I don't want this around my mother." The defendant replied, "Do you own this damn little joint around here?" to which Don said, "Yes, when I am at it I own it." Defendant then said, "Damn you, you make me get out," and Lon said, "Well, I can make you get out." Upon this, Lon and Sam went to take hold of defendant and put him out, and, according to this witness' testimony, the defendant "gave a lick back that way, and socked that knife in that young-un's throat and broke the blade off in his throat, and he cut Lonz in the arm, and him not trying to do a thing with him." She further testified, "The defendant and his wife had been living in my home going on three weeks. They asked my husband — Hort asked my husband to let him come. He let him come. They were just to stay until he could get a place to go to." The other witnesses for the State substantially corroborated the testimony of Mrs. Lankford.
Lon Lankford testified in part that he and Leonard, the deceased, were just trying to push the defendant out of the house when he felt his own arm cut and saw the defendant strike back at Leonard. After he was out, this witness stated, he struck defendant across the back with a chair because he saw that he was coming back to him, and after he had been cut he had tried to hit him with a chair in the house but could not. He testified that Absher "did not look like he was drinking much. He might have had a drink."
Hort Absher, the defendant, testified that he came to the house with his wife and little boy, went to the kitchen to get a drink of water, walked out and talked to Leonard Lankford, deceased, that he had no trouble with him at all, and that when he walked in the house Leonard walked in front of him, went out of the house to the woodpile, got some wood and brought it in, and went out in the direction of the barn. That Sam Lankford and Lon Lankford pretty soon went out of the house toward the barn. That defendant and Mrs. Lankford got into an argument over Brycie's gun barrel, which defendant had hidden. Defendant testified that the boy said he would shoot his father. He refused to tell where the gun barrel was hidden, and Mrs. Lankford began to beat him over the head with a strap fastened to a stick, used profanity and *Page 128 
obscenity toward him, and said she would kill him if she had the strength; and then sent a little girl to the barn, saying, "Tell Lon and Leonard to come in there and kill the s. o. b." Lon and Leonard came into the house, where a controversy ensued about the argument with Mrs. Lankford. Defendant said, "Boys, I am fixing to leave here and I don't want no trouble. I will be gone in five minutes." His wife was fixing his clothes so that he might go to Mount Airy and get a job. The following is a copy from the transcript of defendant's testimony at this point:
"Before she got my clothes ready they jumped on me and Lon jumped on me with the chair, hit me in the head with it, and Leonard Lankford come on me with his fist, and I staggered back to the kitchen door when Lon hit me with the chair, the ceiling was so low he couldn't bring the chair over his head, he brought it sideways and knocked me back into the door and Leonard come in and hit me in the face with his fist. Well, I shoved him backward and I struck at Lon with my fist and missed him, and shoved him back into the table, and he come around with the chair again and hit me, and shoved Leonard back again and somewhere there was a knife laying on the table. I don't say that the boy got the knife. He was making for the knife — Leonard Lankford. Well, I come out with my knife. They told me they were going to kill me. I got my knife out of my right front pocket and used it in my right hand. I struck at Lon Lankford with my knife, and he hit me with the chair, and my knife went over and hit Leonard Lankford. I didn't at any time strike Leonard Lankford with my knife.
"Lonz struck at me again with the chair and I struck at him and cut him across the arm, and the next time he struck at me with the chair I struck at him with the knife, and the knife blade struck the chair and broke off and hit the floor.
"I got my knife out because they beat me with the chair and said they were going to kill me three or four different times. They told me they were going to kill me and beat me with a home-made chair like that over the head, and I expect that was a good idea toward killing a man.
"After the blade was broken — my wife had gotten there by that time, and they got me out at the back door of the porch into the house and off in the yard, and about the time I hit the yard I was knocked down with a chair. Lonz Lankford did that, and by that time my wife got hold of me — I don't know that he struck at me or her, but anyhow he knocked both of us down with a chair. She come in on top of me, and she got up and started to leave with me, and he told her, `Turn him loose,' Lonz Lankford said, `Turn him loose,' says, `I will finish killing the G . . d . . . s. o. b.' So we went on around the house, me and my wife, and Lonz Lankford — and when we got around the house Lonz *Page 129 
Lankford beat me with a chair until we got in the front yard, knocked me down three or four times in the front yard out there, and my wife once or twice — I won't say whether it was once or twice.
"I had five holes knocked in the back of my head. My wounds were bleeding, and I was bloody all over. My shirt (I had on a coat) and coat was torn to pieces, and I had a cut place or two in my coat. I have the coat right here to show for myself, and this Arl Lankford, he come up about that time. He had a bone-handled knife about that long, and he beat me in the head with it, and Sam Lankford was talking to him, begging him not to hurt me, and he said he was going to cut the G.. d... s. o. b.'s head off. I begged them to leave me alone.
"I says, `You boys going to kill me, or what are you going to do?' They followed me as far as from here to below — as far as from here to Dr. Mitchell's down here from the house, beating me."
Defendant further testified: "My father-in-law asked me to move there to the house; I didn't rent it from anybody, it was not rented, but he asked me to move there and take care of his wife, let my wife wait on his wife while she was in a weakly condition. I didn't intend to stay there so very long; I aimed to stay there two or three months; no, not until I could get a job. I was not paying any rent or board; I hoped Mr. Lankford in his field. I helped around the field there and she helped in the house." There is much other evidence which it is unnecessary to print as it does not directly bear upon the point of the decision.
Inter alia, the judge charged the jury as follows:
"Now, gentlemen of the jury, there has been something said in the argument in this case about the defendant being at his home at the time this difficulty ensued. The court charges you, gentlemen of the jury, if you believe the evidence in this case and find it to be true beyond a reasonable doubt, the house of Zack Lankford was not the home of the defendant but was the home of Zack Lankford and the members of his family that were living there and residing at the time. The court charges you that the defendant was an invited visitor in this home and could be expelled at any time at the will of the owner. He and his family were temporary visitors, that is the defendant and his family were temporary visitors in this home until the defendant could get a job and move his family.
"The court further charges you that if you find from the evidence and beyond a reasonable doubt in this case that Zack Lankford was away from home and his wife told the defendant to leave the place or to leave the premises and that he refused to leave, then the defendant became a trespasser in the home and the wife and other members of the home had the right to use such force as was reasonably necessary to *Page 130 
evict him from the premises. . . . Gentlemen of the jury, if you believe the evidence in this case, that is the evidence of the defendant and the State, that the defendant and his wife and family were making their home there temporarily in the home of Zack Lankford; that they were invited guests in the home and were there with the permission and consent of the owner, then at all times the owners of the premises had the right to control the premises and if you find from the evidence in this case and beyond a reasonable doubt that the owner, that is Zack Lankford, the head of the house, was away from home and that his wife, the wife of Zack Lankford who was there in charge of the premises in his absence — she being his wife and living there — that she had the right, if she saw fit, to order the defendant away from there and if he refused to go he then became a trespasser in the eyes of the law, and to evict him from the premises she and the other members of her family had the right to use that force that was reasonably necessary to evict him from the premises and to get him off of the premises, and the court charges you, gentlemen of the jury, that if he was a trespasser he had no right to repel this force but it was his duty to leave when told to do so if he was told to do so."
In the opinion of the Court, the instructions to the jury are objectionable in that they do not present to the jury the true status of the defendant as an inmate of the Lankford household and entitled to a reasonable consideration of his rights as an occupant thereof. There is no question that he might have been ejected upon reasonable notice; but that he should be reduced to the status of a trespasser eo instanti that he was ordered out by Mrs. Lankford or other inmates of the household, is altogether inconsistent with any status which could arise under the evidence relating to the manner, conditions and terms under which he came into the household, and in our opinion did not justify the summary and forcible ejectment which it is admitted was undertaken.
This instruction necessarily placed the defendant in the wrong abinitio and materially altered, to his prejudice, the right of self-defense based upon his version of the affair and the rules of law applicable thereto. The instructions given were based upon the view that he was such a trespasser as might be instantly ejected by either Mrs. Lankford or any other member of her family who lived there, and who had no right to resist the force used in such an ejectment, and that such force was peacefully used solely toward that end. *Page 131 
Whether the version of the defendant is true or not, it is in the evidence and cannot be ignored by the court. It demanded, at least as an alternative statement of the law, arising upon this phase of the evidence, that the court should have given the ordinary instructions with regard to the right of self-defense in case of assault where a person has the right to be. S. v. Greer, 218 N.C. 660, 666, 12 S.E.2d 238; S. v. Finch,177 N.C. 599, 600, 99 S.E. 409.
For error in this respect, the defendant is entitled to a
New trial.