### STATE v. MELLOTT FAUST

(Filed 1 March, 1961.)

**1. Criminal Law § 99—**

On motion to nonsuit, the evidence is to be considered in the light most favorable to the State, giving it the benefit of every reasonable inference which may fairly be drawn therefrom.

**2. Same—**

Contradictions and discrepancies in the State's evidence are to be resolved by the jury.

**3. Homicide § 17—**

Ordinarily, premeditation and deliberation are susceptible to proof only by proof of circumstances from which they may be inferred.

**4. Same—**

Circumstances which may be properly considered upon the question of premeditation and deliberation are want of provocation on the part of the deceased, the conduct of defendant before and after the killing, threats and declarations of the defendant before and during the *corpus delicti,* and the dealing of lethal blows by the defendant after deceased had been felled and rendered helpless.

**5. Homicide § 4—**

"Cool state of blood" as used in connection with premeditation and deliberation in homicide cases does not mean the absence of passion

101

and emotion, but an unlawful killing is deliberate and premeditated if done pursuant to a fixed design to kill, notwithstanding that defendant was angry or in an emotional state at the time.

**6. Homicide § 20— Evidence of premeditation and deliberation held sufficient to be submitted to the jury.**

The State's evidence tended to show that two police officers were attempting to arrest two Negro boys who had engaged in a fight with knives, that a large crowd gathered, including several women, who assaulted the officers, that one of the officers attempted to arrest one of the women, that defendant, who had been standing on the sidewalk talking to other persons, took this officer's gun from its holster while his arms were pinned to his side by the crowd, that defendant made a threat of death to the officer, stepped back holding the gun beside his leg, that the other officer started toward defendant but did not draw his gun, and that defendant raised the pistol and fired when the officer was some fifteen feet away and then walked to where the officer had been pulled by the crowd and fired five more shots into his prostrate body. *Held:* The evidence shows a lack of lawful provocation of defendant or affront or menace to, or assault upon him, and is sufficient to be submitted to the jury on the question of premeditation and deliberation.

**7. Criminal Law § 113—**

The Court is not required to give requested instructions in the language of the request, but it is sufficient if the court correctly charges the law embodied in the request insofar as it contains correct statements of legal principles applicable to the evidence, either in response to the prayer or otherwise in some portion of the charge.

**8. Homicide § 24—**

Where the court correctly defines premeditation and deliberation and instructs the jury that if the purpose to kill is formed simultaneously with the killing there could be no premeditation and deliberation, it is not an error for the court to refuse to give *verbatim* requested instructions that if defendant did not decide to kill the deceased before he fired the fatal shot the defendant could not be guilty of murder in the first degree.

**9. Same—**

The evidence tended to show that defendant killed one of the two officers who were attacked by a crowd as they were attempting to make an arrest. The court, in giving full and correct instructions on premeditation and deliberation, charged that in order to convict defendant of murder in the first degree the jury would have to find from the evidence beyond a reasonable doubt that defendant killed the deceased in futherance of a fixed design for revenge or other unlawful purpose, and not because he was under the influence of violent passion suddenly aroused by some lawful cause or legal provocation. *Held:* It was not error for the court to refuse to give requested instructions predicated upon rage and anger incited by deceased's mistreatment of a designated person involved in the riot.

**10. Same—**

Where the court fully and correctly instructs the jury upon the law

of self-defense, it is not error for the court to refuse to give verbatim defendant's requested instructions on this aspect.

**11. Criminal Law § 107—**

The court must give the jury instructions as to the law upon all substantial features of the case arising upon the evidence, including all defenses presented by defendant's evidence, even in the absence of request for instructions.

**12. Homicide § 10½—**

The defense that the death of the deceased was the result of an accident or misadventure must be predicated upon the absence of wrongful purpose on the part of the defendant while engaged in a lawful enterprise and the absence of culpable negligence on his part.

**13. Homicide § 27— Defendant's evidence held insufficient to raise the defense of a killing by accident or misadventure.**

Defendant's testimony was to the effect that he intentionally shot and killed deceased in self-defense. A witness for defendant testified to the effect that defendant became involved in an affray while police officers were attempting to arrest persons engaged in a general disorder and riot, that defendant willingly entered the affray and obstructed the officers in the performance of their duty, and that as a result of the affray between defendant and one of the officers, this officer fell, rolled over, and shot himself. *Held:* Defendant's evidence does not present the defense of death by accident or misadventure, since it discloses that defendant was not engaged in a lawful enterprise, and further, if it be conceded that the officer involuntarily turned the gun upon himself and fired, such result was proximately caused by defendant's own wrongful act, and therefore it was not error for the court to fail to charge the jury upon the defense of accident and misadventure.

**14. Criminal Law § 111— Relationships between defendant and a witness which may result in bias are not limited to relationship by blood or marriage.**

Where the State's evidence tends to show that defendant was one of a crowd which assaulted police officers and interfered with the performance of their duty in attempting to arrest persons engaged in an affray, the court correctly instructs the jury to scrutinize the testimony of the defendant and those closely related to him, notwithstanding the absence of evidence that any of the witnesses were related to defendant by blood or marriage, since relationships which may be the cause of bias are not limited to blood or marriage, and the possibilty of a relationship of sympathy between the members of the crowd disapproving and resisting the arrest of persons by the officers is a sufficient basis for the instruction.

**15. Criminal Law § 94—**

Whether remarks of the court to counsel during the progress of the trial tend to discredit or prejudice the accused or his cause must be determined on the basis of the probable effect of the court's language on the jury, considering the remarks in the light of the circumstances under

which they were made, and it will be presumed that the trial court properly discharged its duty to control the procedure in the interests of an orderly trial, with the burden upon defendant to show prejudice.

**16. Same—**

The record disclosed that defendant's counsel requested that defendant be permitted to complete his answer on cross-examination, that the court readily acceded to this request, and that defendant's counsel then interrupted the cross-examination to suggest to the witness what had been said before, and thus examine the witness out of turn. *Held:* The single admonition of the court that counsel be quiet or the court would have to use some means against him, is not shown to be prejudicial, the remark of the court being considered in the light of the circumstances under which it was made.

APPEAL by defendant from *Hooks, J.,* June 20, 1960 Regular Criminal "A" Term, of MECKLENBURG.

This appeal was docketed as case No. 219 at the Fall Term 1960.

This is a criminal action. The bill of indictment charges that Mellott Faust on 21 May 1960 in Mecklenburg County did unlawfully, wilfully, feloniously and of his malice aforethought, kill and murder Johnny R. Annas.

Defendant was duly arraigned and pleaded not guilty.

Verdict: Guilty of murder in the first degree.

Judgment: Death by inhalation of lethal gas.

Defendant appealed and assigned errors.

*Attorney General Bruton and Assistant Attorney General McGalliard for the State.*

*Charles V. Bell and Peter H. Bell for the defendant.*

MOORE, J. Defendant assigns as error the refusal of the trial court to sustain his motion "for judgment as of nonsuit upon the charge of murder in the first degree." Defendant contends that evidence of premeditation and deliberation is lacking and that the evidence adduced at the trial did not justify a submission of the case to the jury on the charge of first degree murder.

Upon a motion for nonsuit in a criminal prosecution, the evidence must be considered in the light most favorable to the State, and the State is entitled to the benefit of every reasonable inference which may fairly be drawn from the evidence. Contradictions and discrepancies in the testimony of State's witnesses are to be resolved by the jury. *State v. Simpson,* 244 N.C. 325, 331, 93 S.E. 2d 425; *State v. Kelly,* 243 N.C. 177, 180, 90 S.E. 2d 241. See also the many cases cited in Strong: N. C. Index, Vol. 1, Criminal Law, § 99, footnote 800 p. 769.

STATE v. FAUST.

Thirteen witnesses testified for the State. Seven gave eyewitness accounts of the occurrence. The testimony, in its aspect most favorable to the State, tends to show the following facts:

The deceased, Johnny-R. Annas, was a police officer of the City of Charlotte. He and police officer Bruce were on duty on Saturday night, 21 May 1960, and were patrolling the streets of Charlotte in a police car. Both were in uniform. When they arrived at the intersection of Church and Summitt Streets they observed two boys fighting with knives. The combatants were Charles and John Smith, cousins. The policemen stopped at the intersection and the boys ran. The officers pursued and caught Charles, disarmed him and brought him back to the intersection. They discovered that he had been cut and were conducting him to the car for the purpose of taking him to the hospital for treatment. John returned to the scene and started taking off his shirt. Officer Bruce took him by the arm and he started struggling to free himself. A crowd began to gather and ultimately there were 150 to 200 persons at the scene. Annas attempted to help Bruce take John into custody. John began to kick and swing his arms. Bruce took hold of John's leg. The officers pulled John toward the car. Three women came up, screaming and "hollering." The crowd closed in. Annas went to the car to telephone for help. The three women began hitting Bruce and one of them struck him in the face. Bruce drew his gun but the women continued to hit him. John was on the ground and Bruce was holding him down with his left hand. Annas returned and the crowd moved back. Bruce put his gun back in the holster. Annas took hold of John and they again started to the car with him. A woman was still hitting Bruce. Bruce took hold of her and began pulling her toward the car. A number of people grabbed Bruce and were fighting him. His arms were pinned to his sides. Defendant had been standing on the sidewalk talking to three women. Bruce heard his holster unsnap and tried to reach for and recover his gun but was prevented by the persons holding him. He saw defendant with his (Bruce's) pistol. A woman said: "I always hated them . . . . we ought to kill him." Defendant was heard to say: "Kill that . . . son of a bitch." Defendant stepped back, holding the gun down beside his right leg. Bruce was still being held and beaten. Annas started back toward Bruce, but did not draw his gun. When Annas was about fifteen feet from Bruce, defendant raised the pistol and fired and Annas fell on his back. Three men pulled him to the sidewalk. The crowd freed Bruce and he ducked into the crowd and ran to the corner of a nearby house. Defendant walked to Annas, got right over him, and moved around him firing five shots into his body. Defendant reached down and took Annas' pistol and looked toward

the spot Bruce had been. He then left the scene carrying the guns. As he left he shot out a street light. He threw the guns in a vacant lot. Next morning he surrendered at police headquarters. He is twenty-one years old. Upon examination it was found that six bullets had entered Annas' body. One entered behind the right ear and lodged in the brain. Another entered the right cheek opposite the corner of the mouth. There was a wound in the right shoulder. A bullet entered the right chest and passed through the right lung, heart and left lung. One entered above the left chest. And there was a bullet wound in the lower abdomen.

The general principles of law applicable here are well stated in the opinion delivered by *Winborne, J.* (now *C.J.*) in *State v. Bowser,* 214 N.C. 249, 199 S.E. 31, as follows:

"The exceptive assignment principally pressed on this appeal is the refusal of the court to allow defendant's motion for judgment as of nonsuit on the first degree murder charge made in compliance with the statute. C.S., 4643 (G.S. 15-173). The motion challenges the sufficiency of the evidence to show premeditation and deliberation beyond a reasonable doubt. *S. v. Bittings,* 206 N.C. 798, 175 S.E., 299, and cases cited.

"It is pertinent, therefore, to refer to principles applicable to the case in hand.

"Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. C.S., 4200 (G.S. 14-17). *S. v. Payne,* 213 N.C., 719, 197 S.E., 573, and cases cited.

"The intentional killing of a human being with a deadly weapon implies malice and, if nothing else appears, constitutes murder in the second degree. *S. v. Payne, supra,* and cases cited.

" 'The additional elements of premeditation and deliberation, necessary to constitute murder in the first degree, are not presumed from a killing with a deadly weapon. They must be established beyond a reasonable doubt, and found by the jury, before a verdict of murder in the first degree can be rendered against the prisoner.' *S. v. Miller,* 197 N.C. 445, 149 S.E. 590; *S. v. Payne, supra.*

" 'Premeditation means "thought beforehand" for some length of time, however short.' *S. v. Benson,* 183 N.C. 795, 111 S.E. 869, at p. 871; *S. v. McClure,* 166 N.C. 321, 81 S.E. 458; *S. v. Payne, supra,* 197 S.E. 579, and cases cited.

" 'Deliberation means that the act is done in cool state of blood. It does not mean brooding over it or reflecting upon it for a week, a day or an hour, or any other appreciable length of time, but it means an intention to kill, executed by the defendant in a cool state of blood, in furtherance of a fixed design to gratify a feeling of revenge, or

STATE v. FAUST.

to accomplish some unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation.' *S. v. Benson, supra; S. v. Payne, supra.*

"Evidence of threats are admissible and may be offered as tending to show premeditation and deliberation, and previous express malice, which are necessary to convict of murder in the first degree. *S. v. Payne, supra,* and cases cited.

" 'General threats to kill not shown to have any reference to deceased are not admissible in evidence, but a threat to kill or injure someone not definitely designated are admissible in evidence where other facts adduced give individuation to it.' *S. v. Shouse,* 166 N. C. 306, 81 S.E. 333; *S. v. Payne, supra.*

" 'The manner of the killing by defendant, his acts and conduct attending its commission, and his declaration immediately connected therewith were evidence of express malice.' *S. v. Robertson,* 166 N.C. 356, 81 S.E. 689; *S. v. Cox,* 153 N.C. 638, 69 S.E. 419.

" 'In determining the question of premeditation and deliberation it is proper for the jury to take into consideration the conduct of the prisoner, before and after, as well as at the time of, the homicide, and all attending circumstances.' *Stacy, C.J.,* in *S. v. Evans,* 198 N.C. 82, 150 S.E. 678."

It is said in *State v. Watson,* 222 N.C. 672, 673, 24 S.E. 2d 540, that "premeditation and deliberation are not usually susceptible of direct proof, and are, therefore, susceptible of proof by circumstances from which the facts sought to be proven may be inferred. That these essential elements of murder in the first degree may be proven by circumstantial evidence has been repeatedly held by this court. (Citing cases)."

Among the circumstances to be considered in determining whether a killing was with premeditation and deliberation are: Want of provocation on the part of deceased. *State v. Matheson,* 225 N.C. 109, 111, 33 S.E. 2d 590; *State v. Hammonds,* 216 N.C. 67, 75, 3 S.E. 2d 439; *State v. Buffkin,* 209 N.C. 117, 126, 183 S.E. 543. The conduct of defendant before and after the killing. *State v. Lamm,* 232 N.C. 402, 406, 61 S.E. 2d 188; *State v. Chavis,* 231 N.C. 307, 311, 56 S.E. 2d 678; *State v. Harris,* 223 N.C. 697, 701, 28 S.E. 2d 232. Threats and declarations of defendant before and during the course of the occurrence giving rise to the death of deceased. *State v. Dockery,* 238 N.C. 222, 224, 77 S.E. 2d 664; *State v. Hudson,* 218 N.C. 219, 230, 10 S.E. 2d 730; *State v. Hawkins,* 214 N.C. 326, 331, 199 S.E. 284; *State v. Bowser, supra.* The dealing of lethal blows after deceased has been felled and rendered helpless. *State v. Artis,* 227 N.C. 371, 373, 42 S.E. 2d 409; *State v. Taylor,* 213 N.C. 521, 523, 196 S.E. 832.

Defendant contends that all of the evidence tends to show that he acted under the influence of passion suddenly aroused, while violent passion had dethroned his reason, and not in a cool state of blood. He quotes from Black's Law Dictionary the following definition of "cool blood": "Calmness or tranquility; the undisturbed possession of one's faculties and reason; the absence of violent passion, fury, or uncontrollable excitement." We do not understand the term "cool state of blood," as it is applied in determining whether or not there was premeditation and deliberation, to mean an absence of passion and emotion. We think the following explanation is more applicable and definitive: ". . . (A)lthough there may have been time for deliberation, if the purpose to kill was formed and immediately executed in a passion, especially if the passion was aroused by a recent provocation or by mutual combat, the murder is not deliberate and premeditated. However, passion does not always reduce the crime since a man may deliberate, may premeditate, and may intend to kill after premeditation and deliberation, although prompted and to a large extent controlled by passion at the time. If the design to kill was formed with deliberation and premeditation, it is immaterial that defendant was in a passion or excited when the design was carried into effect." 40 C.J.S., Homicide, s. 33(d), pp. 889, 890.

It is true that the evidence of the State is conflicting as to whether or not the officers struck John Smith, threw him down so that his head hit the street, and drug him along the street, and hit Barbara Harris. In any event this conflict of evidence was for the jury to resolve. *State v. Simpson, supra.* Besides, the State's evidence tends to show a lack of lawful provocation for the sudden arousal of violent passion on the part of defendant. It shows no affront or menace to, or assault upon, defendant. On the contrary, it discloses that the officers in the performance of duty were engaged in the unequal task of making arrests and quelling a riot. The efforts of the officers were not directed toward defendant. It appears from the State's evidence that defendant had been standing on the sidewalk talking to three girls, that he deliberately took part in the riot and interfered with the officers engaged in the performance of duty, that he deliberately took officer Bruce's pistol from its holster, and as he did so said "Kill that . . . son of a bitch," that he deliberately shot officer Annas who had not drawn his gun and was fifteen feet away, that after Annas had fallen defendant *walked* to him and brutally fired five bullets at close range into the helpless and inert body of Annas, and that he then took Annas' pistol, looked toward the place Bruce had been, shot out a street light and left the scene.

We think the State's evidence sufficient to justify the court in

overruling the motion and submitting to the jury the question as to whether or not defendant killed the deceased with malice and premeditation and deliberation.

Defendant in apt time submitted to the court in writing prayer for special instructions as follows:

"1. If the evidence educed in the trial of this case has failed to prove to you beyond a reasonable doubt that the defendant decided to kill officer Annas immediately before he fired the first shot into his body, then you may not render a verdict of guilty of murder in the first degree.

"2. If you believe from the evidence brought out in this trial that the deceased officer then and there caught the witness, Barbara Ann, by the hair and drugged or pulled her by it across the street to the car and was there beating her, and that the defendant saw it and that such conduct excited the defendant to great rage and anger, and that he killed the officer while in this state of rage and anger, then you would not bring in a verdict of first or second degree murder but one for manslaughter.

"3. If from the evidence educed in the trial of this case you are of the opinion that at the' time the defendant shot the deceased he reasonably believe the deceased was going to kill him then and there, or inflict upon him great bodily harm, then the defendant had the right to use such force he believed necessary to protect himself — even to the extent of inflicting death. Upon such finding it would be your duty to return a verdict of not guilty."

Defendant assigns as error the refusal of the court to give these instructions verbatim.

Insofar as the requested instructions are correct statements of legal principles and applicable to the instant case, the record discloses that the court instructed the jury in substantial conformity therewith. The court is not required to give requested instructions verbatim; it is sufficient if they are given in substance. *State v. Smith*, 237 N.C. 1, 24, 74 S.E. 2d 291; *State v. Beachum*, 220 N.C. 531, 533, 17 S.E. 2d 674. This the court may do either in response to the prayer or otherwise in some portion of the charge. *State v. Pennell*, 232 N.C. 573, 61 S.E. 2d 593.

The trial judge gave the following instruction: "Premeditation means to think beforehand, and when we say that the killing must be accompanied by deliberation and premeditation, it is meant that there must be a fixed purpose to kill which preceeded the act of killing for some length of time, however short. Although the manner and length of time in which the purpose is formed, is not material. If, however, the purpose to kill is formed simultaneously with the killing, then there

is no premeditation and deliberation, and in that event the homicide would not be murder in the first degree." We think this a correct statement of the law. *State v. Bowser, supra; State v. Spivey,* 132 N.C. 989, 992, 43 S.E. 475. It is a clear statement of the legal principle involved in the first instruction requested. The jury was further instructed that the burden is upon the State to establish each and every element of murder in the first degree beyond a reasonable doubt.

There was no prejudicial error in the refusal of the court to give to the jury the second instruction requested. The trial judge charged the jury in substance that before it could return a verdict of murder in the first degree it must be satisfied from the evidence beyond a reasonable doubt that defendant shot and killed the deceased, that he killed him intentionally, pursuant to a fixed purpose and intent to kill, and that he killed him "of his wilful deliberate and premeditated malice aforethought." And the court charged that deliberation "means an act done (by defendant) in a cool state of blood . . . and in furtherance of a fixed design to gratify his feeling of revenge, or to accomplish some unlawful purpose, and not under the influence of violent passion suddenly aroused by some lawful or just cause or legal provocation." *State v. Lamm, supra.* Thereby the court did not confine the jury's consideration of passion aroused to the conduct of the officers toward Barbara Harris. The charge permitted the consideration of all incidents contained in the evidence which were calculated to inflame defendant's mind. There was testimony that the officers were dragging and beating John Smith. Defendant testified that he was being assaulted without cause or explanation by officer Bruce and that officer Annas was advancing on him with pistol drawn and pointed. There was also testimony that the officers had fired their pistols into the air. The requested instruction might, indeed, have left the impression with the jury that the predicate for passion was limited to the officers' abuse of Barbara Harris. Furthermore, the requested instruction might leave the impression that the defendant had the burden of satisfying the jury of the absence of premeditation and deliberation and the presence of violent passion on the issue of murder in the first degree. Defendant had no such burden.

The court further instructed the jury: "Where a person is without fault and a felonious assault is made upon him, such person upon being assaulted with intent to kill is not required to retreat but may stand his ground and, if he kills his assailant, and believes or has reasonable grounds to believe that it was necessary for him to do so, and if he kills his assailant in order to save his own life or protect himself from great bodily harm, it would be excusable homicide. And this is so whether the necessity be real or apparent. This however is

to be determined by the jury, and from the facts and circumstances as they find them to be from the evidence as they reasonably appeared to the defendant at the time." *State v. Washington*, 234 N.C. 531, 535, 67 S.E. 2d 498. This is a correct statement of the principle which defendant undertakes to incorporate in the third instruction requested.

Error has not been made to appear in the refusal of the court to give the instructions prayed.

Defendant excepts to the failure of the court to explain to the jury the law in regard to homicide by accident or misadventure. It is defendant's contention that from the testimony of Charlie Mae Stewart there is a permissible inference that deceased came to his death by accident.

The court is required to charge the jury the law upon all substantial features of the case arising upon the evidence without a special request. *State v. Ardrey*, 232 N.C. 721, 723, 62 S.E. 2d 53. The defendant is entitled to have the jury consider and pass upon any and all defenses which arise upon the evidence, under proper instructions by the court. *State v. Melton*, 187 N.C. 481, 482, 122 S.E. 17.

In order to better understand the purport of the testimony given by defense witness Stewart, we first examine the testimony of defendant. Defendant's testimony raises the plea of self-defense. It is summarized as follows:

When I arrived at the intersection of Church and Summitt a police car pulled up and stopped. Officer Bruce jumped out and grabbed me in the back. Officer Annas headed into the crowd. Bruce held on to me and Barbara Harris walked behind him. Annas came back with Charles Smith. Bruce turned me loose and attempted to "smack" me and I threw up my arm and blocked the lick. Annas went to call for help. Bruce made some remarks about what he would do to me. I started to walk off; he grabbed me again in the back of my shirt and said I was not going anywhere and that he was going to "kick me up." We got in a tussle. He grabbed me by the shoulder, twisted me around, and we continued scuffling Bruce reached for his gun and I locked his arm with a half nelson and grabbed him around the waist. We were scuffling. I grabbed Bruce's pistol to keep him from grabbing it and shooting me. He attempted to get his gun when he was fighting me, so I grabbed it and put it in my belt. I took it out of his holster. Annas started yelling at me. The crowd yelled to Annas: "Don't shoot, don't shoot." Barbara ran out from Bruce. Bruce stepped away from me and disappeared in the crowd. Annas started walking from the curb with his gun in his hand. He pointed the pistol at me. I started shooting and continued until the gun was empty. He was 20

to 25 feet away. After my first shot he raised the gun back in firing position. He fell after I emptied the gun. After he fell I went over and picked up his gun. It was lying at his feet. I shot to keep him from shooting me. The officers never said I was under arrest.

Charlie Mae Stewart's testimony is somewhat confused and out of proper sequence. Taken as a whole, it recounts the occurrence in substance as follows:

Bruce and Annas grabbed John Smith and were beating him in the chest and threw him down. Annas was beating him when Barbara Harris ran up and begged them not to beat the boy like that. Annas hit Barbara and she ran into him. Annas turned John loose, grabbed Barbara by the hair and ran across the street with her, ran her into the car, and got both her legs in his fists. Defendant went over to Annas and said: "Man, don't hit that woman like that . . . you're not supposed to hit a woman." Annas ran to the car and called for help and then back to where Bruce was holding the boy. Annas grabbed hold of the boy and shot into the air, then dived down toward the boy with the pistol. He pointed the pistol toward Barbara and John. Barbara grabbed Annas, he slung back and was kicking her, trying to get to the boy. Bruce had been shooting his gun in the air, and telling the crowd to get back. Defendant went over and got the gun from Bruce, took it away from him. Bruce grabbed defendant and defendant took his gun. Bruce ran into the crowd. Defendant said to Annas: "Don't hit that woman any more." Annas got up "like he was going to throw it to" defendant, and he ran and they just met together. "When this man throwed the gun on Mellott (defendant), they met together and they came to tussling . . . . the gun went off." I don't know who pulled the trigger. I don't know whose gun went off. Annas kind of leaned and squatted; he whirled and fired twice. You could see the pistol. Annas then fell, rolled over and shot twice more. He raised up in the back and commenced to pull the trigger again. "Annas was shooting the gun on his own self." Defendant then went over and got Annas' gun.

"Where the death of a human being is the result of accident or misadventure, in the true meaning of the term, no criminal responsibility attaches to the act of the slayer. Where it appears that a killing was unintentional, that the perpetrator acted with no wrongful purpose in doing the homicidal act, that it was done while he was engaged in a lawful enterprise, and that it was not the result of negligence, the homicide will be excused on the score of accident." 26 Am. Jur., Homicide, s. 220, p. 305. The negligence referred to in the foregoing rule of law has been declared by this Court to mean something more than actionable negligence in the law of torts. It imports wantonness,

recklessness or other conduct, amounting to culpable negligence. *State v. Crisp,* 244 N.C. 407, 94 S.E. 2d 402; *State v. Kluckhohn,* 243 N.C. 306, 90 S.E. 2d 768; *State v. Early,* 232 N.C. 717, 62 S.E. 2d 84. For definition of culpable negligence, see *State v. Early, supra.*

The testimony of Stewart does not make the defense of accident and misadventure available to defendant. Defendant is met at the threshold by the requirement that he be engaged in a lawful enterprise. It appears from Stewart's evidence that defendant intervened in behalf of persons the officers were attempting to arrest, engaged in a general disorder and riot, willingly entered in combat with Annas, and obstructed the officers in the performance of duty. It does not appear from the evidence that either Barbara Harris or John Smith were members of defendant's family or that the officers were in the act of slaying them. Against the background of his own testimony the most defendant may claim from Stewart's version is that he acted in self-defense. If it be assumed that after Annas had fallen he involuntarily turned the gun upon himself and fired, the conclusion is inescapable that this proximately resulted from the altercation with defendant. The court did not commit error in failing to submit to the jury accident and misadventure as a defense.

Defendant excepts to the following portion of the judge's charge: ". . . the court instructs you that it is your duty to carefully consider and scrutinize the testimony of the defendant, and of those who are closely related to him, and in passing upon the evidence of such witnesses, the jury ought to take into consideration the interest of the witnesses in the result of this action."

Specifically, defendant objects to the clause "those who are closely related to him." He contends that there were no witnesses in the case closely related to him, none related by blood or marriage. He argues that there is an implication of relationship by race which is calculated to prejudice the jury against defendant. The logic of the argument is difficult to follow. The record makes no reference to the racial derivation of any of the witnesses. Information on this point may be obtained only from remarks of witnesses or references by the court in recapitulating the evidence. But from such facts as may be gleaned from the record it appears that four State's witnesses were of defendant's race — three of them eyewitnesses. If race was the basis of the challenged instruction, the instruction applied alike to State's and defendant's witnesses of that race.

It does not appear that the court had any particular relationship exclusively in mind. Bias need not prevail over the obligation of a solemn oath in any relationship, however close, of a witness to an

interested party or to a cause. But experience teaches that bias be-
cause of relationship often colors the testimony of witnesses.

The relationships which might cause bias are legion. "Any sort of
connection which is perceived or imagined between two or more
things, or any comparison which is made by the mind, is a relation."
Webster's New International Dictionary, 2d Ed. (1936), p. 2102.
The law recognizes relationships far beyond blood and marriage.
"Although relationship to a party should not discredit the witness,
still this is a circumstance which may be weighed by the jury. So
also social and business relations, intimacy or hostility, and other
circumstances which are creative of bias may properly be considered."
Jones on Evidence, 5th Ed. (1958), Vol. 4, s. 991, p. 1867. "The range
of external circumstances from which probable bias may be inferred
is infinite. . . ." Wigmore on Evidence, 3d Ed. (1940), Vol. III, s.
949, pp. 499-504. *State v. Nat*, 51 N.C. 114; *People v. Cowan*, (Cal.
1905), 82 P. 339.

There is a strong possibility of a relationship of sympathy between
the people gathered at the intersection of Church and Summitt on
the night of 21 May 1960, disapproving and resisting the arrest of
persons involved with the officers. This might indeed be a close re-
lationship, analagous to that of accomplices. In any event, the court
properly charged, immediately following the challenged instruction:
". . . if you believe such witnesses have sworn to the truth, then you
will give to his or her testimony the same weight you would give to
that of any other disinterested or unbiased witness."

The challenged instruction, as limited by that next above quoted,
is proper and correct. In it we perceive no error prejudicial to de-
fendant.

During the cross-examination of the defendant by the solicitor the
following transpired:

Defendant: ". . . At the time I shot him, I was excited and nervous.

"Mr. Bell (counsel for defendant): May I say this to your Honor,
I would like for the witness to have an opportunity to complete his
answer. (Parentheses added).

"The Court: You may complete your answer if you have anything
further to say.

"Mr. Bell: Go ahead, you said you were nervous and excited.

"The Court: Be quiet, if you don't I will have to use some means
against you.

"Mr. Bell: All right.

Defendant: "I said I was nervous and excited and scared and that
I could not truthfully say anything, could not say anything because
I don't know nothing to say."

(Cross-examination continued).

Defendant contends that the statement of the court to defense counsel was a reprimand in the presence of the jury calculated to cause the jury to infer that counsel was dealing unfairly with the court "and that the judge was against the defendant."

This Court has said: "Every person charged with crime has an absolute right to a fair trial. By this it is meant that he is entitled to a trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. . . .

"The trial judge occupies an exalted station. Jurors entertain great respect for his opinion, and are easily influenced by any suggestion coming from him. As a consequence he must abstain from conduct or language which tends to discredit or prejudice the accused or his cause with the jury . . . .

"The bare possibility, however, that an accused may have suffered prejudice from the conduct or language of the judge is not sufficient to overthrow an adverse verdict. . . . The criterion for determining whether or not the trial judge deprived an accused of his right to a fair trial by improper comments or remarks in the hearing of the jury is the probable effect of the language upon the jury. . . . In applying this test, the utterance of the judge is to be considered in the light of the circumstances under which it was made. This is so because 'a word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.' . . ." *State v. Carter*, 233 N.C. 581, 65 S.E. 2d 9.

In the following circumstances the remarks of the presiding judge have been held not to be prejudicial: Court directed counsel to sit down and permit witness to complete his answer without interruption, and added: "This is not a Roman circus." *State v. Davis*, 253 N.C. 86, 116 S.E. 2d 365. The court frequently reprimanded counsel for interruptions and argumentativeness. *State v. Walker*, 251 N.C. 465, 112 S.E. 2d 61. The judge commanded counsel to sit down. *State v. Gibson*, 233 N.C. 691, 65 S.E. 2d 508. The court gave the jury a brief recess between speeches of counsel and commented: "We have no band to play between speeches." *State v. Rowe*, 155 N.C. 436, 71 S.E. 332. Counsel repeatedly interrupted the speech of the prosecuting attorney; the court reprimanded counsel in these words: "Now, if you don't stop making those remarks I am going to fine you; those remarks are not proper remarks to be made." *Henderson v. State* (Texas 1941), 152 S.W. 2d 743. The court addressed counsel as follows: "Now, Mr. Hilliard, I will tell you once more not to ask any more questions about that matter; the objection to that has been sustained several

STATE *v.* FAUST.

times. If you persist in it, I shall have to take some strenuous measures to prevent these questions, and if necessary I will make an example of you in preserving the dignity of this court." *Almond v. People,* (Colo. 1913) 135 P. 783.

The rules generally applied in determining whether the remarks of the trial judge to counsel are prejudicial are: (1) The burden is upon appellant to show prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in the light of the circumstances under which they were made, and (4) the ultimate consideration is the probable effect of the language upon the jury. *State v. Gibson, supra; State v. Carter, supra;* 62 A.L.R. 2d 166-264.

The following circumstances are pertinent in the instant case. The defendant was being cross-examined by the solicitor and the cross-examination had not been completed. The court readily acceded to the request of defense counsel that defendant be permitted to complete his answer. Counsel in his zeal interrupted to suggest to witness what had been said before, and thus examined the witness out of turn. It does not appear that defendant was limited in any way in giving testimony or that counsel would have been prevented from examining defendant on redirect, if he had desired to do so.

It was the attempt to examine defendant out of turn that occasioned the judge's remark. The effect of the admonition was that counsel should desist or that measures would be taken against him. The entire remark consisted of a single sentence, the words were moderate and appeared to be dispassionate. There were no other incidents of this nature during the trial. Applying the rules enunciated above, we are of the opinion that prejudicial error does not appear. The court was doing nothing more than exercising that control of procedure which is essential to an orderly trial. We do not believe the incident could have been misunderstood by a jury of reasonable citizens.

Assignments of error 3 and 9 have been carefully examined and considered. We find them to be without merit. No good purpose would be served by extended discussion.

In the trial of the case below, we find

No error.