STATE OF NORTH CAROLINA v. WILLIAM J. "BILL" DOOLEY

No. 57

(Filed 10 April 1974)

1. Criminal Law § 113— court's duty to charge on defenses

The trial court has the duty to charge the jury on all defenses presented by defendant's evidence without special request therefor. G.S. 1-180.

2. Homicide § 28— duty to instruct on self-defense

Where there is evidence that defendant acted in self-defense, the court must charge on this aspect even though there is contradictory evidence by the State or discrepancies in defendant's evidence.

3. Homicide § 28— instructions — final mandate — possible verdicts — not guilty by reason of self-defense

The trial judge in a homicide prosecution erred in failing to include not guilty by reason of self-defense as a possible verdict in his final mandate to the jury, and such error was not cured by the discussion of the law of self-defense in the body of the charge.

ON *certiorari* to review the decision of the North Carolina Court of Appeals reported in 20 N. C. App. 85, 200 S.E. 2d 818 (1973), which found no error in the trial before *McLean, J.,* at the 9 April 1973 Criminal Session of GASTON Superior Court.

In an indictment proper in form defendant was charged with murder in the first degree of Troy L. (Towhead) Thomas.

State v. Dooley

At the call of the case the State announced that it was not seeking a conviction of murder in the first degree, but rather was seeking a conviction of either murder in the second degree or manslaughter "as the evidence might present itself." Defendant was found guilty of manslaughter and from a judgment imposing a sentence of imprisonment for not less than 12 years nor more than 15 years, defendant appealed to the Court of Appeals. That court found no error in the trial. We allowed *certiorari* on 5 February 1974.

The State's evidence reveals that on 18 January 1973 about 1:50 p.m. officers from the Gastonia Police Department responded to a call to investigate a shooting at the home of defendant at 1013 West Airline in Gastonia, North Carolina. At the rear of defendant's house they found Troy L. (Towhead) Thomas lying on his back near some railroad tracks, some twenty feet from a dilapidated fence enclosing defendant's back yard. Thomas had been shot in the forehead and was rushed to a local hospital. One week later Thomas died as a result of the head wound inflicted by a .22 caliber weapon.

When the police first arrived at defendant's house, they found defendant sitting on his front porch drinking liquor. One of the investigating officers, Officer Charles Bell, informed defendant of his *Miranda* rights. Defendant then told the police where they could find the gun. As a result Officer Bell went into the bedroom and found a .22 caliber pistol under a pillow on defendant's bed. Defendant was then arrested and taken to the local police station. While there defendant on several occasions said, "I killed the son-of-a-bitch," and "Towhead Thomas was no good." These statements were admitted into evidence against defendant at trial.

During cross-examination by defense counsel, Officer Bell acknowledged that there was one eyewitness to the shooting, Robert Cunningham, and also that defendant had made a statement to the police at 2:57 p.m., approximately one hour after the shooting. Defense counsel sought to get this statement by defendant into evidence, but the State's objection to its admission was sustained by the trial judge. Officer Bell also testified that although he had found no weapon near the deceased's body, he had not looked for a weapon until the following day, 19 January 1973. However, another investigating officer from the Gastonia Police Department, Officer William Spratt, did testify

that on the day of the shooting he did not observe a weapon of any kind on the deceased or in the area around the deceased.

The State also offered the testimony of Officer Charles Heafner of the Gastonia Police Department. Heafner testified that he examined the .22 caliber pistol found at defendant's house and found three empty, or fired, cartridges in the chamber.

Defendant's evidence consisted of testimony by a defendant, Robert Cunningham, and Officer Bell. Testimony given by Cunningham and defendant tends to show the following: Defendant has only one leg and must use crutches to get around. He raised puppies in his back yard, and rats had been killing his puppies. On the afternoon of 18 January 1973 he took his wife's .22 caliber pistol into his back yard to try to kill some of the rats. His back yard was enclosed by a dipalidated wire fence about four feet in height. While he was in his back yard Robert Cunningham, an acquaintance, walked by on the railroad tracks behind defendant's house and "hollered" at him. Defendant called Cunningham over and, after some conversation, Cunningham bought a watch and pocketknife from defendant for $5. Defendant and Cunningham continued talking for about five or ten minutes, after which Thomas, the deceased, came walking down the railroad tracks.

Both defendant and Cunningham had known Thomas for many years. According to defendant, in 1964 he had given Thomas a ride home. When he got to Thomas's house, Thomas asked defendant to take him somewhere to get some liquor. Defendant was in a hurry and refused. Thomas, apparently without any warning, got out of the car and came over to defendant's side of the car and took a bottle opener and cut defendant on the throat. Defendant testified that during the intervening nine years he had not spent any time with Thomas and had avoided him.

Thomas saw defendant and Cunningham and came over to the fence and asked them whether they had anything to drink, explaining that he was sick and wanted a drink. Cunningham told Thomas that he had given his last $5 to defendant, and Thomas then turned to defendant and asked him if he would get him a drink and some cigarettes. Defendant agreed, gave Cunningham the $5, and told him to go get some wine and cigarettes at a store less than a block away. As Cunningham was

leaving to get the wine, he heard Thomas say he was sorry he had cut defendant in 1964. According to defendant, while Cunningham was gone he and Thomas discussed defendant's reasons for his not having had anything to do with Thomas since the cutting incident. When Cunningham returned, defendant and Thomas were "friends." Cunningham gave the quart bottle of wine he had purchased to Thomas, and Thomas drank "it all but about two swallers." Defendant drank the rest. As Thomas started to leave, he turned to defendant and said, "Well, we'll be friends from now on." The two then shook hands over the fence, and defendant said, "Anytime you see me now, I'll be your friend from now on." Thomas replied, "Okay," turned and started walking toward the railroad tracks.

Thomas had almost reached the tracks when he suddenly turned around and started running toward defendant with a three-inch blade pocketknife in his hand crying, "You goddam son-of-a-bitch, I'm going to kill you, or you're going to kill me." Defendant, who was on the other side of the fence from Thomas, told Thomas to stop and attempted to move backwards. In doing so he dropped one of his crutches and fell part-way down. When Thomas was some six to eight feet away from him and still on the other side of the fence, defendant pulled the .22 caliber pistol from his pocket and fired a shot into the ground. Thomas kept "coming straight on just as hard as he could come," and so defendant fired twice more "in the air." When defendant fired the second and third shots, Thomas "was reaching for the fence and fixing to throw his leg over the fence." The third shot hit Thomas in the head. Thomas then stopped, turned around and walked back towards the tracks. He sat down on the tracks and then "laid backwards on his back."

Cunningham immediately left to call the police and an ambulance. Defendant walked into his house, put the pistol under the pillow on his bed, and sat down on his front porch while he waited for the police to arrive. He drank either a pint or one-half pint of liquor before the police arrived.

Defendant testified that he shot Thomas "because I was scared of him. I was afraid he would get over that fence and kill me with the pocketknife. I said I had known Mr. Thomas or Mr. Thomas' reputation prior to the time that he came there on January 18, 1973. On January 18, 1973 I knew Troy Thomas' general character and reputation as a dangerous and violent fighting man with a knife."

State v. Dooley

Cunningham also testified that he knew Thomas's reputation in the community as being a dangerous and violent fighting man with a knife. Cunningham further testified that Thomas was "mad" when he was coming toward defendant with the knife, and that he did not hear defendant threaten Thomas at any time prior to the shooting. Under cross-examination by the State, Cunningham denied that he and defendant had been drinking buddies for years, but admitted that he had been tried once for driving under the influence, had been convicted "of being drunk" several times, and that on one occasion "they had me for an assault with a deadly weapon."

During cross-examination by the State, defendant stated that except for the two inches of wine he drank out of the bottle Cunningham had bought, he had nothing to drink on 18 January prior to the shooting and that he was not drunk at the time of the shooting. In response to the solicitor's question, "Would you say it's a fair statement that you've been drunk some thirty-eight or forty times in the last few years?" Defendant replied that he could not remember how many times it had been.

Officer Bell, one of the investigating officers who had testified for the State, also testified for defendant. Bell stated that at 3:30 p.m. on the afternoon of the shooting Cunningham had made a statement to the police. This statement was read to the jury and was received into evidence for the sole purpose of corroborating the testimony Cunningham had already given about the shooting. Officer Bell also testified as follows: "I don't know it to be a fact that Troy Thomas is dangerous. All I know is what I've heard. Well, I know for a fact that he's bad to drink. I've heard that he was dangerous with a knife. He would cut people."

*Attorney General Robert Morgan, Deputy Attorney General James F. Bullock, and Associate Attorney E. Thomas Maddox, Jr., for the State.*

*Harris and Bumgardner by Don H. Bumgardner for defendant appellant.*

MOORE, Justice.

Defendant brings forward fourteen assignments of error designated as Exceptions Nos. I to XIV. We first consider Exception No. XIV, which defendant states in his brief as follows:

"The defendant objects and excepts in the record to the failure of the court to charge the jury in his mandates to the jury the following proposition: 'Or, if you are satisfied that the defendant acted in self-defense, then it will be your duty to return a verdict of not guilty.' "

[1] G.S. 1-180 requires that the trial judge fully instruct the jury as to the law based on the evidence in the case. It is the duty of the court to charge the jury on all substantial features of the case arising on the evidence without special request therefor. *State v. Todd*, 264 N.C. 524, 142 S.E. 2d 154 (1965); *State v. Spencer*, 256 N.C. 487, 124 S.E. 2d 175 (1962); *State v. Jones*, 254 N.C. 450, 119 S.E. 2d 213 (1961); *State v. Faust*, 254 N.C. 101, 118 S.E. 2d 769 (1961), cert. den. 368 U.S. 851, 7 L.Ed. 2d 49, 82 S.Ct. 85 (1961). And all defenses presented by defendant's evidence are substantial features of the case. *State v. Faust, supra*. See also *State v. Sherian*, 234 N.C. 30, 65 S.E. 2d 331 (1951).

[2] Where there is evidence that defendant acted in self-defense, the court must charge on this aspect even though there is contradictory evidence by the State or discrepancies in defendant's evidence. *State v. Hipp*, 245 N.C. 205, 95 S.E. 2d 452 (1956); *State v. Sherian, supra; State v. Riddle*, 228 N.C. 251, 45 S.E. 2d 366 (1947).

At the outset of the charge the trial judge explained that defendant was presumed to be innocent and that the burden rested with the State to satisfy the jury beyond a reasonable doubt of defendant's guilt before they could convict him. After general instructions and a review of the evidence of the State and of defendant, instructions were given as to the elements of second degree murder and of manslaughter. The court then charged the jury in substance that the intentional use of a deadly weapon as a weapon when death proximately results from such use gives rise to the presumptions (1) that the killing was unlawful, and (2) that it was done with malice, and that an unlawful killing with malice is murder in the second degree. The trial judge further charged that in such event it would be incumbent upon defendant to satisfy the jury of facts sufficient to mitigate the killing and reduce it to manslaughter or to excuse it altogether on the ground of self-defense. The court then gave a general statement as to the law of self-defense and as to what the defendant must satisfy the jury in order to mitigate the

killing and reduce it to manslaughter or to excuse it altogether on the ground of self-defense.

In the final mandate to the jury the court stated:

"So, I charge you, members of the jury, that if you find from the evidence beyond a reasonable doubt that on this 18th day of January, 1973, the defendant intentionally and with malice and without justification or excuse, shot the deceased, Thomas, with a pistol as has been offered in evidence here as State's Exhibit 3, thereby proximately causing Thomas' death, nothing else appearing, it would be your duty to return a verdict of guilty of murder in the second degree.

"However, if you do not so find, or have a reasonable doubt as to one or more of these things, it would be your duty to return a verdict of not guilty of murder in the second degree; or, if, in a fair and impartial consideration of all the facts and circumstances in the case, there should arise in your minds a reasonable doubt as to either element of the offense of murder in the second degree, it would be your duty to give the defendant the benefit of that doubt, and to acquit him on the count of murder in the second degree.

"Now, if you find the defendant guilty of murder in the second degree, you will not consider the count of manslaughter. But, if you find the defendant not guilty of murder in the second degree, then, you will consider whether or not he be guilty of the offense of manslaughter.

"So, the court instructs you, members of the jury, if you find the defendant not guilty of murder in the second degree, but you find from the evidence beyond a reasonable doubt that on or about the 18 day of January, 1973, the defendant intentionally shot Thomas with a deadly weapon, that is, the pistol offered in evidence here as State's Exhibit 3, thereby proximately causing Thomas' death, but you are satisfied that the defendant killed Thomas without malice, or that he killed him in the heat of a sudden passion, and that in doing so, that he used excessive force in the exercise of self-defense, it would be your duty to return a verdict of manslaughter. If you do not so find, you would return a verdict of not guilty; or, if upon a fair and impartial con-

State v. Dooley

sideration of all the facts and circumstances in the case there should arise in your minds a reasonable doubt as to this offense of manslaughter, it would be your duty to give the defendant the benefit of that doubt, and to find him not guilty upon the count of manslaughter.

EXCEPTION XIV

"Now, if you find the defendant not guilty of murder in the second degree, and you find the defendant not guilty of manslaughter, it would be your duty to return a verdict of not guilty.

"Now, are the twelve in the box all in good health, and feel like you can deliberate and return a verdict in this case? All right, at this time, the court will excuse the 13th and 14th jurors. You may stand aside. The twelve may retire and deliberate as to your verdict, and after you have reached a verdict, which must be unanimous, come back in the courtroom, please. You may retire."

Defendant contends that following the mandate on manslaughter the jury should have been instructed: "Or, if you are satisfied that the defendant acted in self-defense, then it will be your duty to return a verdict of not guilty."

[3] We agree with defendant that a specific instruction on self-defense should have been given by the trial judge in his final mandate to the jury. Defendant's defense rested solely on self-defense. Although the court prior to the final mandate explained the law relating to self-defense, in his final instruction he omitted any reference to self-defense other than to say "but [if] you are satisfied that the defendant killed Thomas without malice, or that he killed him in the heat of a sudden passion, and that in doing so, that he used excessive force in the exercise of self-defense, it would be your duty to return a verdict of manslaughter." Here in the final mandate the court gave special emphasis to the verdicts favorable to the State, including excessive use of force in self-defense as a possible verdict. At no time in this mandate did the court instruct the jury that if it was satisfied by the evidence that defendant acted in self-defense, then the killing would be excusable homicide and it would be their duty to return a verdict of not guilty.

The failure of the trial judge to include not guilty by reason of self-defense as a possible verdict in his final mandate

to the jury was not cured by the discussion of the law of self-defense in the body of the charge. By failing to so charge, the jury could have assumed that a verdict of not guilty by reason of self-defense was not a permissible verdict in the case. The defendant was entitled under the law, following the mandate on manslaughter, to an instruction substantially as follows:

> "If, however, although you are satisfied beyond a reasonable doubt that the defendant did intentionally shoot Thomas and thereby proximately caused his death, if you are further satisfied, not beyond a reasonable doubt, but are satisfied that at the time of the shooting the defendant did have reasonable grounds to believe and did believe that he was about to suffer death or serious bodily harm at the hands of Thomas, and under those circumstances he used only such force as reasonably appeared necessary, you the jury being the judge of such reasonableness, and you also are satisfied that the defendant was not the aggressor, then he would be justified by reason of self-defense, and it would be your duty to return a verdict of not guilty."

See *State v. Fowler, ante,* 90, 203 S.E. 2d 803 (1974); *State v. Camp,* 266 N.C. 626, 146 S.E. 2d 643 (1966); *State v. Faust, supra; State v. Washington,* 234 N.C. 531, 67 S.E. 2d 498 (1951).

The trial court's failure to include such an instruction in its final mandate to the jury was prejudicial error and entitles defendant to a new trial.

The questions raised by defendant's other assignments of error may not recur upon a new trial. Hence, particular consideration thereof upon the present record is deemed inappropriate.

The case is remanded to the North Carolina Court of Appeals with direction that it remand it to the Superior Court of Gaston County for a new trial in accordance with the principles herein stated.

New trial.