GEER, Judge.
 

 Defendant appeals from a conviction of first degree murder in the death of Robert Davis. We conclude defendant is entitled to a new trial because the trial court failed to include "not guilty by reason of self-defense" as a possible verdict in its final mandate to the jury.
 

 The State's evidence tended to prove the following. In July 2000, defendant shared an apartment in Greensboro with his mother, Pam Pannell; his step-father, Robert Davis; and his girlfriend, Latoshia Cheek. Defendant and Davis had a hostile relationship because Davis would take Pannell's disability checks.
 

 Defendant's friends - Sean Edwards, Jermaine Leak, and Jonathan Spinks - frequently visited the apartment. On 11 July 2000, Davis called the police to complain about defendant's friends being in the apartment. The responding officers observed a large quantity of marijuana on the kitchen table, but when no one admitted ownership, the drugs were simply seized and no one was arrested. While at the apartment, the officers learned that a warrant for defendant's arrest was outstanding for failure to appear at a court proceeding. Defendant was instructed to turn himself in the next day. Once the police were gone, defendant left the apartment with his friends for two hours. When he returned, defendant announced to his girlfriend that he and his friends had devised a plan to kill Davis and that "everybody knows their part."
 

 The next day, 12 July 2000, after defendant had failed to voluntarily turn himself in, police returned to the apartment and arrested defendant on the outstanding warrant. Defendant spent the night in jail, but was released at approximately 7:30 p.m. on 13 July 2000.
 

 When defendant and Cheek arrived at the apartment that night, defendant's friend Edwards was already there. Davis and Pannell were in their bedroom. Defendant said to Edwards, "Let's do this. Let's fight." Defendant instructed Cheek to call his mother out of the bedroom. Edwards testified that when he entered the bedroom, defendant was already arguing and wrestling with Davis. Edwards did not know who started the fight. Edwards testified that he then hit Davis in the head and face several times while defendant held Davis.
 

 Leak arrived at the apartment and went into the bedroom after hearing sounds of fighting. Leak testified that he saw defendant and Davis wrestling, but that Edwards was standing to the side. According to both Leak and Edwards, defendant asked Leak to get a knife. Leak went to the kitchen, found a knife, returned to the bedroom, and set the knife on a dresser. Leak testified that defendant said, "Cut him." Instead, Leak left the bedroom and apartment to go home. Edwards testified that he too refused to cut Davis and left the apartment.
 

 Edwards testified that he got about halfway to his home, but then turned around and returned to the apartment. When he arrived, Spinks was in the living room with Cheek and defendant's mother. Edwards and Spinks then went into the bedroom, where they found Davis on the floor with his throat cut and defendant sitting on the bed leaning over Davis. Although there was a puddle of blood on the floor, defendant, according to Edwards, was not holding a weapon. Edwards testified that defendant told Spinks to cut Davis'throat and that Spinks did so with a knife that was leaning against Davis' chest. Defendant, Edwards, and Spinks then moved Davis into the bathroom and put his body in the bathtub. An autopsy revealed that Davis had bled to death due to "sharp force injury of the neck."
 

 Edwards left the apartment while defendant and Spinks cleaned up the bedroom. Davis' body was put in a duffle bag, loaded into the back of a truck, and driven to a dead-end road. Defendant and Spinks then attempted to dispose of Davis' body by burning it.
 

 Defendant and Cheek spent the night at a motel, where defendant told Cheek his version of the killing. According to Cheek, defendant said that, "they was fighting [and] that somehow [Davis] had stashed a whole bunch of box cutters and knives in the bedroom, and that when they was fighting, [Davis] had got ahold of one and had [defendant] in some kind of hold that he was cutting his arm - [Davis] was cutting [defendant's] arm - and that he had gotten free, and that somehow [defendant] had cut [Davis'] neck." Cheek saw a small wound on defendant's arm.
 

 The next day, defendant and Cheek returned to where the body had been left. When they attempted to finish burning the partially charred body, officers who had the couple under surveillance stopped them and placed defendant under arrest. Defendant was charged with first degree murder. Defendant testified at trial that he had killed Davis in self-defense and that he did not plan to kill Davis. Defendant claimed that he was afraid of Davis because Davis had a butcher knife, was a "crack" cocaine addict, "and he wasn't scared of me at all." According to defendant, Davis started the fight. While they were wrestling, defendant saw that Davis held a butcher knife, which cut defendant's right arm. Defendant testified that he wrested the knife from Davis' hand and cut Davis on the neck with the knife. Defendant testified that he remembered cutting Davis only one time, but later saw two cuts. At the point when Spinks entered the room, Davis had tried to knee defendant in the groin, and defendant dropped the knife. Although defendant had disarmed Davis, defendant testified, "[h]e had numerous amounts of knives and box cutters around the room. . . . I had no idea where any more was or if he could be able to get ahold of any more."
 

 According to defendant, Spinks then stabbed Davis in the neck with a box cutter. Defendant claimed that he never told any of his friends to cut Davis. Defendant said he did not help Davis or call an ambulance after Davis was wounded because Davis died quickly. Defendant admitted burning Davis' body and otherwise attempting to hide the crime.
 

 The trial court instructed the jury as to first degree murder, voluntary manslaughter, and self-defense. The jury found defendantguilty of first degree murder, and the court sentenced him to life in prison without parole.
 

 Defendant contends the trial court erred in failing to include in its final mandate to the jury a possible verdict of "not guilty by reason of self-defense." Although the trial court discussed the law of perfect self-defense in the body of the court's charge, the trial judge's final mandate to the jury only included the following:
 

 So I charge that if you find from the evidence beyond a reasonable doubt that on or about the alleged date the defendant intentionally and not in self-defense killed the victim with a deadly weapon, thereby proximately causing the victim's death, and that the defendant acted with malice, with premeditation and deliberation, it would be your duty to return a verdict of guilty of first-degree murder. However, if you do not so find or have a reasonable doubt as to one or more of these things, you will not return a verdict of guilty of first-degree murder.
 

 If you do not find the defendant guilty of first-degree murder, you must determine whether he is guilty of voluntary manslaughter.
 

 If you find from the evidence beyond a reasonable doubt that on or about the alleged date the defendant intentionally killed the victim with a deadly weapon and thereby proximately caused the victim's death, and the defendant was the aggressor in bringing on the fight or used excessive force, it would be your duty to find the defendant guilty of voluntary manslaughter even if the State has failed to prove that the defendant did not actin self-defense. However, if you do not find or have a reasonable doubt as to one or more of these things, it would be your duty to return a verdict of not guilty.
 

 The trial court thus failed, i n its final mandate, to instruct the jurors that if they found that defendant acted in self-defense, the killing would be excusable homicide and it would be their duty to return a verdict of not guilty.
 

 We note that the parties dispute whether the pattern jury instructions required that the final mandate include a self-defense verdict. This dispute is immaterial since our courts have held for thirty years that if a trial court instructs a jury on perfect self-defense, the trial court must also include the possible verdict of "not guilty by reason of self-defense" in its final mandate to the jury.
 
 State v. Dooley,
 

 285 N.C. 158
 
 , 166 ,
 
 203 S.E.2d 815
 
 , 820 (1974). Our Supreme Court has held that the omission of the possible verdict is not "cured by the discussion of the law of self-defense in the body of the charge."
 

 Id.
 

 Instead, "[t]he trial court's failure to include such an instruction in its final mandate to the jury [is] prejudicial error and entitles defendant to a new trial."
 

 Id.
 
 See also State v. Williams,
 

 154 N.C. App. 496
 
 , 499,
 
 571 S.E.2d 886
 
 , 888 (2002) (new trial ordered because even though the trial court included instruction on self-defense in the body of the charge, it did not include the possibleverdict in the final mandate);
 
 State v. Kelly,
 

 56 N.C. App. 442
 
 , 445,
 
 289 S.E.2d 120
 
 , 122 (1982) (stating that
 
 Dooley
 
 is controlling and ordering a new trial because trial court had instructed on self-defense in the body of the charge, but had failed to include that potential verdict in the final mandate).
 

 Dooley
 
 directs that defendant is entitled to a new trial. We do not address defendant's remaining argument regarding the jury instructions as it was not properly preserved for appellate review and, in light of our disposition of this appeal, no need exists to invoke the plain error doctrine. Defendant's final contention that use of a short-form murder indictment is unconstitutional has been rejected by our Supreme Court.
 
 State v. Hunt,
 

 357 N.C. 257
 
 , 274,
 
 582 S.E.2d 593
 
 , 604,
 
 cert. denied,
 
 ___ U.S. ___,
 
 156 L. Ed. 2d 702
 
 ,
 
 124 S. Ct. 43
 
 (2003).
 

 New trial.
 

 Chief Judge MARTIN and Judge HUDSON concur.
 

 Report per Rule 30(e).